1  MENNEMEIER, GLASSMAN & STROUD LLP
   KENNETH C. MENNEMEIER (SBN 113973)
2  STEPHEN LAU (SBN 221051)
   980 9th Street, Suite 1700
3  Sacramento, CA 95814
   Telephone: (916) 553-4000
4  Facsimile: (916) 553-4011

5  Attorneys for Defendants
   SAMUEL SLAYDEN, DENISE GILSETH,
6  CATHY MCJILTON, AND KELLY STROMGREN

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 A.G. EDWARDS & SONS, INC.,            )  CASE NO: 07-05154 WHA
                                         )
12          Plaintiff,                   )  **DEFENDANTS' OPPOSITION TO**
                                         )  **PLAINTIFF'S APPLICATION FOR A**
13 v.                                    )  **TEMPORARY RESTRAINING ORDER**
                                         )
14 SAMUEL SLAYDEN, DENISE GILSETH,       )  DATE:        October 10, 2007
   CATHY MCJILTON, and KELLY             )  TIME:        1:00 p.m.
15 STROMGREN,                            )  ROOM:        9
                                         )  JUDGE:       Hon. William Alsup
16          Defendants.                  )
                                         )  Complaint Filed:    October 9, 2007
17 _____)

18                            **I.**

19                       **INTRODUCTION**

20          On May 31, 2007, Wachovia Securities announced that it would acquire A.G.

21 Edwards. As a result, A.G. Edwards will cease to exist. Wachovia has publicly announced that

22 it will consolidate offices, close hundreds of branches, and lay off thousands of employees.

23 A.G. Edwards employees face a change. They can do nothing, and end up at Wachovia by

24 default. Or, they can explore their options, make a conscious decision, and move to another firm

25 if they wish.

26          Defendants Samuel Slayden, Denise Gilseth, Cathy McJilton, and Kelly

27 Stromgren Lee confronted that choice, made their choice, and moved to one of A.G. Edwards'

28

1   and Wachovia's competitors, Stifel, Nicolaus & Co.  They handled their departure honorably and

2   professionally.  Wachovia (which is using A.G. Edwards' name for this suit) fears the

3   competitive effect that Defendants will have working for their new employer.  It also wants to

4   intimidate other brokers from moving by suing those that do.  So, Plaintiff now asks the Court to

5   issue a temporary restraining order ("TRO") that would forbid Defendants from talking to any of

6   the clients they previously serviced at Edwards about opportunities at Stifel.

7           This Court should not issue such a TRO.  A temporary restraining order "is an

8   extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear*

9   *showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)

10  (emphasis in original).  Here, Plaintiff A.G. Edwards & Sons, Inc. ("Plaintiff" or "Edwards") has

11  utterly failed to carry that burden.

12          Defendants Samuel Slayden, Denise Gilseth, Cathy McJilton, and Kelly

13  Stromgren are former employees of Plaintiff who are now employed by Stifel Nicolaus, one of

14  Plaintiff's competitors.  Plaintiff now seeks emergency relief from the Court in connection with

15  its allegations that Defendants have (1) unlawfully solicited Plaintiff's employees and clients,

16  and (2) used trade secrets that they acquired before resigning from Edwards.  But Plaintiff is not

17  entitled to a TRO both as a matter of fact and as a matter of law:

18          •       Foremost, Plaintiff's claim that it needs emergency relief is undercut by its

19                  unexplained delay in filing this application.  By Plaintiff's own admission, it

20                  waited almost *three weeks* after Defendants began working at Stifel before filing

21                  this TRO application.

22          •       Second, Plaintiff will not suffer irreparable injury if a TRO is not issued.

23                  Plaintiff's claim of irreparable harm is undercut by the fact that it previously

24                  signed the Protocol for Broker Recruiting, in which Plaintiff tacitly acknowledged

25                  the fact that brokers routinely switch firms, and acquiesced in the principle that

26                  they may take client  lists with them.  Plaintiff's claim of irreparable harm is

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER REGARDING PRELIMINARY INJUNCTION

1  further undercut by its internal policy that the client relationship is owned by the

2  brokers, and not the firm.

3  •  Third, Plaintiff cannot succeed on its claim that Defendants acted unlawfully by

4  soliciting clients developed while at Edwards.  Plaintiff has made no showing that

5  Defendants had a statutory, contractual, or any other legal duty to refrain from

6  such solicitation.

7  •  Fourth, Plaintiff's evidentiary showing is defective, in that all of the critical

8  statements in the declarations are mere allegations made on "information and

9  belief," and not on the declarants' personal knowledge.

10  •  Finally, Plaintiff has not carried its burden of showing that the Defendants have

11  misappropriated information that constitutes trade secrets.  In particular, the

12  evidence will show that the customers for which Defendants retained names and

13  contact information were customers that Defendants *personally serviced*.

14  Consequently, as a matter of law, the identities of those customers are not

15  protectable from Defendants as trade secrets.

16  For these reasons, the Court should deny Plaintiff's application for a temporary restraining order.

17  **II.**

18  **ARGUMENT**

19  A temporary restraining order ("TRO") is an extraordinary remedy to be granted

20  as an exception rather than as the rule.  *Sid Berk, Inc. v. Uniroyal, Inc.*, 425 F.Supp. 22, 28 (C.D.

21  Cal. 1977).  The issuance of a TRO is the exercise of a very far reaching power which should

22  never be indulged unless clearly warranted.  *Dymo Industries, Inc. v. Tapeprinter, Inc.*, 326 F.2d

23  141, 143 (9th Cir. 1964).

24  "A party is entitled to a temporary injunctive relief upon demonstrating either

25  (1) a combination of probable success on the merits and the possibility of irreparable injury, or

26  (2) that serious questions are raised and that the balance of hardships tips sharply in its favor."

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER REGARDING PRELIMINARY INJUNCTION

1 *Riverdeep, Inc. v. Cokem Int'l, Ltd.*, 2006 U.S. Dist. LEXIS 60700 (N.D. Cal. 2006) (citing *A&M*

2 *Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001)). "These two formulations

3 represent two points on a sliding scale in which the required degree of irreparable harm increases

4 as the probability of success decreases." *Id.* (citing *Prudential Real Estate Affiliates, Inc. v. PPR*

5 *Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000)). In other words, "where a party can show a

6 strong chance of success on the merits, he need only show a possibility of irreparable harm.

7 Where, on the other hand, a party can show only that serious questions are raised, he must show

8 that the balance of hardships tips sharply in his favor." *Bayer Corp. v. Roche Molecular Sys.*, 72

9 F. Supp. 2d 1111, 1116 (N.D. Cal. 1999) (citing *MAI Systems Corp. v. Peak Computer, Inc.*, 991

10 F.2d 511, 516 (9th Cir. 1993)).

11 **A.    Plaintiff's Delay in Applying for Emergency Relief Undercuts Its Argument
that Such Relief Is Necessary Now.**

12

13 Foremost, Plaintiff has failed to demonstrate any urgency or any threat of

14 immediate irreparable harm.

15 In order to obtain a TRO, the plaintiff "must *demonstrate* immediate threatened

16 harm." *Caribbean Marine Services Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988)

17 (emphasis in original) (reversing order granting preliminary injunction where the trial court "did

18 not require a showing that the harms alleged by the [plaintiffs] were imminent or likely); *Jackson*

19 *v. Schwartz*, 2007 U.S. Dist. LEXIS 51661 (E.D. Cal. 2007) (TRO applicant must demonstrate

20 "the necessity for immediate relief."). Here, Plaintiff has failed to demonstrate such immediacy.

21 According to the Plaintiff, Defendants Slayden, McJilton, and Gilseth left

22 Edwards on *September 20, 2007* – nineteen days before Plaintiff filed its application. Hatcher

23 Declaration at ¶ 35. Defendant Stromgren resigned on *October 1, 2007* – eight days before

24 Plaintiff filed. *Id*. All of the Defendants commenced employment with Stifel immediately after

25 their departure from Edwards – a fact of which Plaintiff was surely aware, as each of the

26 Defendants had to change their registration from Edwards to Stifel, Nicolaus & Co. In addition,

27 they continued to work in the same office building as the Edwards office. *Id*. Plaintiff was also

28

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER REGARDING PRELIMINARY INJUNCTION**

1    surely aware that, in the days following Defendants' departure from AG Edwards, many of the

2    clients previously serviced by Defendants began transferring to Stifel. *Id*. at ¶ 43. Nevertheless,

3    between September 20 to October 8, Plaintiff did not move for a temporary restraining order

4    against any of the Defendants. Simply put, Plaintiff's delay in applying for emergency relief

5    undercuts its argument that such relief is necessary now.[1]

6

7    **B.    Plaintiff's Cannot Show That They Will Suffer Irreparable Harm, Or Any Harm at All, Stemming From the Transfer of Customer Accounts to Stifel.**

8         Plaintiff complains that it stands to suffer irreparable harm because numerous

9    customers who were previously serviced by Defendants have began transferring their accounts

10   out of Edwards to Stifel. However, Plaintiff suffers no irreparable harm as a result of these

11   transfers.

12   **1.    By Signing the Protocol for Broker Recruiting, Plaintiff Tacitly Admitted That It Will Not Suffer Irreparable Harm From the**

13   **Departure of Employees, or From Their Taking of Client Lists.**

14        Plaintiff can claim no irreparable harm from the departure of Defendants, or from

15   their taking of customer lists, because Plaintiff has signed the "Protocol for Broker Recruiting."

16   In signing that Protocol, Plaintiff tacitly admitted "that it is content . . . with the idea that brokers

17   will leave and take client lists with them." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v.*

18   *Brennan*, 2007 U.S. Dist. LEXIS 34501 (D. Ohio 2007).

19        In *Merrill Lynch v. Brennan*, the defendants were financial consultants who left

20   Merrill Lynch to work for Bear Stearns. Merrill Lynch applied for a TRO against the defendants

21   when they began soliciting their former clients developed while working at Merrill. The court

22   denied the application because, among other reasons, Merrill Lynch failed to demonstrate that it

23   would suffer irreparable harm. Specifically, the court stated:

24        [I]n 2001, Merrill, along with industry peers, signed the Protocol
          For Broker Recruiting ("the Protocol"). In essence, the Protocol

25        allows brokers, under certain conditions, to bring client lists with

26   _____

27   [1]    In particular, there is no need to issue emergency relief as to Defendant Gilseth,

28   who is away on vacation and who will not return to the office until October 22, 2007.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER REGARDING PRELIMINARY INJUNCTION

1
2
3

> them when transferring firms.  Although Bear Stearns  is not a
> signatory to this agreement, Merrill's signature indicates that they
> understand the fluid nature of the industry; brokers routinely switch
> firms and take their client lists with them.  By setting up such a
> procedure for departing brokers to take client lists, Merrill tacitly
> accepts that such an occurrence does not cause irreparable harm.

4
5
6
7

*Id*. at *2.  The Court went on to observe that, "given the existence of the Protocol, it appears that

Merrill and industry peers are well aware of, and content with, the idea that brokers will leave

and take client lists with them. Such an agreement significantly undercuts the notion that such

behavior destroys customer goodwill."  *Id*. at *3.

8
9
10

Defendants understand that A.G. Edwards has signed the Protocol.  In doing so, it

has made the same tacit admissions.[2]

11
12

### 2.    Plaintiff Suffers No Harm From the Loss of Client Relationships To Which Plaintiff Claimed No Ownership Interest in the First Place.

13
14
15

Furthermore, Plaintiff will suffer no harm from the loss of those clients who

followed Defendants to Stifel, because, *by A.G. Edwards' own admission*, those client

relationships did not belong to Plaintiff in the first place.

16
17
18

Gene Diederich, an Executive Vice President and Director of Branches at A.G.

Edwards, recently made the following representation to A.G. Edwards brokers:  "*Wachovia

Securities shares our belief that the FC* [Financial Consultant]*, not the firm, owns the client

relationship.*"  Declaration of James Lee (filed herewith), Exhibit A (emphasis added).  By this

19
20
21

statement, Mr. Diederich makes two important points.  First, Mr. Diederich is clearly inferring

that a business relationship with a client (i.e., the client's good will and willingness to do

business in the future) is something valuable, something to which an ownership interest can

22
23
24

attach.  Second, Mr. Diederich is stating that this ownership interest is one that belongs entirely

to the broker, and not to the firm.  In light of that admission, Plaintiff cannot properly claim any

25
26
27
28

---

[2]    In that case, Plaintiff's counsel here (Anthony Paduano) represented the defendants there who successfully argued that participation in the Protocol precludes a finding of irreparable harm.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER REGARDING PRELIMINARY INJUNCTION

1 ownership interest in those departing clients' future business, and therefore cannot claim that it

2 has suffered actionable injury when those clients choose to leave Edwards.

3    **C.    Plaintiff Cannot Succeed on Its Claims of Wrongful Solicitation, Because Defendants Had No Duty to Refrain From Soliciting Plaintiff's Clients or**

4    **Employees.**

5        Plaintiff argues that Defendants acted unlawfully in contacting and soliciting

6 Edwards clients after joining Stifel.  Plaintiff cannot succeed on this theory, because Defendants

7 had no legal or contractual duty to refrain from contacting Plaintiff's clients.

8
                    **1.    Defendants Do Not Have a General Duty to Refrain From Soliciting**
9                    **Plaintiff's Clients or Employees.**

10        California public policy has long recognized "the right inherent in all people, not

11 fettered by negative covenants upon their part to the contrary, to follow any of the common

12 occupations of life.  Every individual possesses as a form of property, the right to pursue any

13 calling, business or profession he may choose."  *Continental Car-Na-Var Corp. v. Moseley*, 24

14 Cal. 2d 104, 110 (1944).  Pursuant to that public policy, the law imposes no general duty to

15 refrain from competing for the clients of a former employer.  To the contrary, "a former

16 employee has the right to engage in competitive business for himself (or with others) and to enter

17 into competition with his former employer, even for those who had formerly been the customers

18 of his former employer, provided such competition is fairly and legally conducted."  *Id*.

19 Similarly, the public policy in favor of employee mobility also means "that competitors may

20 solicit another's employees if they do not use unlawful means or engage in acts of unfair

21 competition."  *Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 860

22 (1994).

23        In short, Defendants had no general duty to refrain from contacting and soliciting

24 either the clients or the employees of A.G. Edwards.  To the contrary, the law gives Defendants

25 an affirmative right to do so.

26

27

28
**DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER REGARDING PRELIMINARY INJUNCTION**

### 2. Defendants Also Had No Contractual Duty to Refrain From Soliciting the Clients of A.G. Edwards.

Plaintiff quotes extensively from various employments agreements that were signed by the Defendants. However, those agreements are unavailing for Plaintiffs.

#### a. Slayden, Gilseth, and Stromgren Had No Contractual Duty to Refrain From Soliciting Plaintiff's Clients, and McJilton Has Not Solicited Plaintiff's Clients.

Paragraphs 12 through 25 of the Hatcher Declaration quotes from the Investment Broker Agreements that were signed by Slayden, Gilseth, and Stromgren. However, the language quoted by Plaintiff says nothing about a duty of the broker not to solicit Edwards customers after leaving the company.[3] Hatcher Declaration at ¶¶ 12-30. Hence, Slayden, Gilseth, and Stromgren had no contractual duty to Plaintiff to refrain from soliciting Edwards customers. And to the extent that McJilton has a duty to refrain from soliciting Edwards clients by virtue of Paragraph 30 of her Financial Associate Agreement, Plaintiff has produced no evidence that McJilton has breached such a duty. In fact, the evidence will show that McJilton – in her capacity as a registered sales assistant at Stifel – has not solicited and does not solicit clients.

#### b. Slayden and Gilseth Had No Contractual Duty to Refrain From Soliciting Plaintiff's Employees, and Stromgren and McJilton Have Not Solicited Plaintiff's Employees.

The Hatcher Declaration points out that the agreements signed by Stromgren and McJilton contain language prohibiting them from soliciting Plaintiff's *employees*. Hatcher Declaration at ¶¶ 25, 29. (Such language does not appear in the agreements signed by Slayden or Gilseth.) Specifically, the agreements signed by Stromgren and Hatcher contain language prohibiting them, for a period of one year after leaving Edwards, from soliciting Edwards

---

[3]     Defendants do not concede that such a non-solicitation clause would be enforceable even if it were part in the employment agreements. According to the Ninth Circuit, "the applicable California law is that the employer will be able to restrain by contract only that conduct of the former employee that would have been subject to judicial restraint under the law of unfair competition, absent the contract." *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1338 (9th Cir. 1980). Thus, to the extent that Defendants' freedom to solicit Edwards customers is restricted by the law of unfair competition, any non-solicitation covenant restricting that freedom would be void and unenforceable.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER REGARDING PRELIMINARY INJUNCTION

employees for other employment.[4]  Hatcher Declaration at ¶¶ 25, 29.  However, Plaintiff has produced no evidence that either Stromgren or McJilton has solicited Edwards employees since joining Stifel.  In fact, the evidence will show that they have not.

### D.    Plaintiff Cannot Succeed on Its Trade Secret Claim, Because It Has Failed to Show That Defendants Have Misappropriated Any Trade Secrets.

Next, Plaintiff contends that Defendants have misappropriated and used Plaintiff's trade secrets.  As the party seeking extraordinary relief, and as the party asserting the existence of a trade secret, the burden falls squarely on Plaintiff to make a clear showing that Defendants have taken trade secret.  *See Scott v. Snelling & Snelling, Inc.*, 732 F. Supp. 1034 (N.D. Cal. 1990) ("The determination of whether a particular type of information is confidential or a trade secret would generally be a question of fact, with the party asserting the existence of a trade secret bearing the burden of proof.").  Here, Plaintiff has simply not met that heavy burden.  Plaintiff's application papers do not even specifically identify what information they allege to be trade secrets, much less prove that such information meets the elements of trade a secret.  This defect alone is fatal to Plaintiff's TRO application.

To the extent that Plaintiff claims that its *customer lists* constitute a trade secret, Plaintiff must meet a particularly heavy burden: proving that the customers on that list were not those personally serviced by Defendants.  In *Moss, Adams & Co. v. Shilling*, 179 Cal. App. 3d 124 (1986), the First Appellate District ruled that the names of customers of an accounting firm that were known by the employees because they had provided services for those customers did not constitute a trade secret.  Similarly, in *Scott v. Snelling & Snelling, Inc.*, 732 F. Supp. 1034 (N.D. Cal. 1990), Judge Lynch found that customer lists are not trade secrets where the former employee "developed the customer lists through their own efforts personal knowledge and business contacts.  In such circumstances, the California courts have repeated held that a customer list does not constitute a trade secret for the purposes of enforcing a covenant

---

[4]    Again, Defendants do not concede that such a non-solicitation clause is enforceable in the first instance.

1   restraining competition because 'equity has no power to compel a man who changes employers

2   to wipe clean the slate of his memory.'" *Id.* at 1044. Moreover, to the extent that the name of a

3   customer is not a trade secret for that reason, the contact information for those customers is also

4   not a trade secret. *Moss, Adams & Co.*, 179 Cal. App. at 129.

5       Here, the evidence will show that any customer information taken by Defendants

6   pertain to those customers that Defendants personally serviced and with whom Defendants

7   developed a personal relationship. As such, a list of such customers fit within the exception set

8   forth in the *Moss* and *Scott* cases and do not constitute trade secrets.

9       **E.    Plaintiff Overreaches with the Broad Scope of Its Proposed Injunction.**

10      Plaintiff seeks a broad temporary restraining order restricting Defendants from,

11  among other things, "soliciting or otherwise initiating any further contact or communication with

12  any client of Edwards whom Defendants served or whose names became known to Defendants

13  while in the employ of Edwards . . . ." Proposed Order at 2:9-13. Read literally, this proposed

14  injunction would prohibit Defendants from communicating with (1) those third party clients who

15  already left transferred their accounts from Edwards to Stifel, or (2) those third-party clients who

16  are currently with Edwards but who will independently choose to follow Defendants to Stifel,

17  even without solicitation by Defendants. Simply put, Plaintiff's proposed injunction impedes on

18  the rights of third parties (i.e., Plaintiff's former and current clients) to move their business

19  wherever they please. To the extent Plaintiff contends that such an injunction is necessary to

20  protect it from irreparable harm, Plaintiff's application must be rejected.

21      Plaintiff's request for such an absurdly broad injunction is telling. That is,

22  Plaintiff's current lawsuit is not about preserving fair competition, or about protecting the

23  welfare of its clients. To the contrary, Plaintiff's proposed injunction reflects that it has no

24  regard for an open marketplace, for California's public policy in favor of employee mobility, or

25  even for the freedom of Plaintiff's clients to make their own choices. Rather, this lawsuit is

26  about one thing and one thing only: protecting the interests of A.G. Edwards, whatever the costs

27  to its former employees and its own clients.

28
DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER REGARDING PRELIMINARY INJUNCTION

1    **F.    Plaintiff's Declarations Are Defective.**

2        The Court must strike, or at least disregard, all of the critical statements in

3    Plaintiff's declarations.  Under applicable rules, those declarations have no evidentiary value.

4        Local Rule 7-5(b) prescribes the form for declarations.  They must "conform as

5    much as possible to the requirements of FRCP 56(e)."  Local Rule 7-5(b).  If a statement is made

6    on information and belief, the declarant "must specify the basis therefor."  *Id.*  Non-compliant

7    declarations may be stricken in whole or in part.  *Id.*  This Court enforces that rule.  *See Jane*

8    *Doe I?V v. Texaco, Inc.*, 2006 U.S. Dist. LEXIS 76111 (N.D. Cal. 2006) ("the rules governing

9    admissibility of evidence are intrinsic to our judicial system and are very important").

10       Against that standard, Plaintiff's declarations are fatally defective.  The Hatcher

11   Declaration makes statements "on information and belief" at least sixteen (16) times.  Hatcher

12   Decl., at pages 2 (lines 12 and 16), 3 (lines 4, 5, and 6), 4 (line 8), 11 (line 17), 12 (lines 7-9), 13

13   (line 9), 14 (lines 4, 6, 9, 11, and 14), and 15 (lines 12 and 18).  The Paduano Declaration makes

14   at least one declaration "on information and belief."  Paduano Decl., at 2:28-3:5.  In fact, it

15   appears that every statement regarding Defendants' allegedly wrongful conduct is made based on

16   "information and belief."  At the same time, the declarants say absolutely nothing about the basis

17   for their information and belief.  Under these circumstances, the Court should disregard those

18   defective portions of Plaintiff's declarations.

19                                  **III.**

20                            **CONCLUSION**

21       For the foregoing reasons, Plaintiff's application for a temporary restraining order

22   must be denied.

23   Dated: October 10, 2007                    MENNEMEIER, GLASSMAN & STROUD LLP
                                                KENNETH C. MENNEMEIER
24                                              STEPHEN LAU

25

26                          By:    /s/ Kenneth C. Mennemeier
                                   Kenneth C. Mennemeier, Attorneys for Defendants
27                                 Samuel Slayden, Denise Gilseth, Cathy McJilton,
                                   and Kelly Stromgren

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER REGARDING PRELIMINARY INJUNCTION