1  MENNEMEIER, GLASSMAN & STROUD LLP
   KENNETH C. MENNEMEIER (SBN 113973)
2  STEPHEN LAU (SBN 221051)
   980 9th Street, Suite 1700
3  Sacramento, CA 95814
   Telephone: (916) 553-4000
4  Facsimile: (916) 553-4011

5  Attorneys for Defendants
   Samuel Slayden, Denise Gilseth,
6  Cathy McJilton, and Kelly Stromgren

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 | A.G. EDWARDS & SONS, INC.,              | CASE NO: 07-CV-05154 WHA
12 |         Plaintiff,                       | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO MODIFY TEMPORARY RESTRAINING ORDER**
13 | v.                                       |
14 | SAMUEL SLAYDEN, DENISE GILSETH,          | Date:      November 9, 2007
   | CATHY MCJILTON, and KELLY                | Time:      tba
15 | STROMGREN,                               | Courtroom: 9
16 |         Defendants.                      | Complaint Filed: October 9, 2007
17 |                                          | TRO Issued:      October 10, 2007

18

19

20

21

22

23

24

25

26

27

28

445.03.PLE.modify.tro.cover.wpd

POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO MODIFY TRO

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................. ii

I. INTRODUCTION ........................................................................ 1

II. FACTUAL BACKGROUND ......................................................... 3

    A. The Events That Led to Defendants' Departure From A.G. Edwards .......... 3

    B. Defendants' Departure From A.G. Edwards ............................... 4

    C. Procedural Background ........................................................ 5

III. ARGUMENT ............................................................................ 6

    A. As Defendants Cannot Obtain an Expedited Review of the TRO from FINRA Arbitrators, this Court Should Modify the TRO, Just as the Court Anticipated During the October 10, 2007 Hearing .................... 6

        1. Due to the Plaintiff's Stalling Tactics and the Unavailability of The FINRA Arbitrators, the Arbitration Hearing Will Not Conclude Until November 17, 2007 at the Earliest ................ 6

        2. To the Extent that the Court Issued the TRO to Protect A.G. Edwards' Right to Fair Competition, Edwards No Longer Requires Such Judicial Protection ........................................ 8

    B. At the October 10 Hearing, Plaintiff Misrepresented its Evidence ............ 9

        1. The Defendants Did Not Solicit Clients to Transfer Their Accounts Prior to Resigning from A.G. Edwards ........................ 9

        2. Slayden, Gilseth, and Stromgren Have No Contractual Duty to Refrain From Soliciting Clients They Previously Served at A.G. Edwards ................................................. 11

    C. The TRO Should Be Lifted Because Defendants Have Surrendered the Documents They Retained When They Departed From Edwards ........... 13

        1. Redacted Browse List ...................................................... 13

        2. Defendant Stromgren's Electronic Spreadsheet File .................. 14

        3. Defendant Gilseth's Electronic Spreadsheet File ....................... 15

IV. CONCLUSION ......................................................................... 16

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Carribean Marine Sers. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) .................................................. 13

*Scott v. Snelling & Snelling, Inc.*,
732 F. Supp. 1034 (N.D. Cal. 1990) .......................................... 13

## FEDERAL REGULATIONS

Federal Rule of Civil Procedure
Section 65 .................................................................... 8

## STATE CASES

*Moss, Adams & Co. v. Shilling*,
179 Cal. App. 3d 124 (1986) ........................................ 13, 14, 15

## STATE DOCKETED CASES

*A.G. Edwards v. John Lee, Sacramento Superior Court*,
Case No. 07AS03926 ........................................................... 5

## MISCELLANEOUS

NASD Code of Arbitration Procedure for Industry Disputes
Rule 13904(d) ................................................................ 8

## I.

## INTRODUCTION

On May 31, 2007, Wachovia Securities announced that it would acquire A.G. Edwards ("Edwards" or "Plaintiff"). As a result, A.G. Edwards will cease to exist. Wachovia has publicly announced that it will consolidate offices, close branches, and lay off thousands of employees. Every A.G. Edwards employee faced a change. They could do nothing, and end up at Wachovia by default. Or, they could explore their options, make a conscious decision, and move to another firm if they wished. Defendants Sam Slayden, Denise Gilseth, Cathy McJilton, and Kelly Stromgren confronted that situation, made their choices, and moved to one of A.G. Edwards' and Wachovia's competitors, Stifel, Nicolaus & Co. ("Stifel").

On October 9, 2007, Edwards filed a complaint against Defendants in this Court, along with an application for a temporary restraining order ("TRO"). On October 10, based on a limited factual record, this Court issued a TRO. That TRO, among other things, prohibits Defendants from soliciting clients they serviced when they were employed at Edwards. The Court issued that TRO in apparent reliance on four representations that Plaintiff made in its papers and during oral argument:

- That within approximately fifteen days of October 10, arbitrators of the Financial Industry Regulatory Authority ("FINRA") would hold an evidentiary hearing and determine, on an expedited basis, whether to issue a permanent injunction;
- That Defendants solicited clients to transfer their accounts to Stifel *before* they resigned from Edwards;
- That Defendants have contractual obligations that prohibit them from soliciting clients whose accounts they serviced at Edwards; and
- That Defendants took from Edwards and used materials that are confidential, proprietary, or subject to trade secret protection.

In the past three weeks, each of those representations has either been proven false or rendered moot. Foremost, it is now clear that Defendants will not obtain a decision from FINRA arbitrators any earlier than November 16, 2007. Although an arbitration hearing was

held on October 22 and 23, Plaintiff consumed those two days with stalling tactics. After two full days of hearing, Plaintiff has completed the examination of only one of the four Defendants, while Defendants had no opportunity to present their own case-in-chief. Due to the arbitrators' unavailability over the next two weeks, the hearing will not resume until November 15, 2007. In the mean time, the Defendants remain enjoined from contacting their former clients and offering those clients an alternative to Wachovia.

It has also become clear that Plaintiff misled this Court on October 10 when it claimed to have evidence that Defendants solicited clients to go to Stifel before they resigned from Edwards. Specifically, Plaintiff presented an internal Edwards form, dated September 28, 2007, relating to a client's request to transfer her account from Edwards to Stifel. That document identified the client's broker as Kelly Stromgren, who did not resign until October 1, 2007. According to Plaintiff, the only permissible inference was that Stromgren and the other Defendants had solicited clients to leave A.G. Edwards before they resigned from Edwards. But, there was an innocent explanation for the fact that the document identified Ms. Stromgren as the client's broker -- an explanation that was abundantly clear to A.G. Edwards at the time.

In actuality, the account transfer was requested by a long-time client *of Denise Gilseth*, who had resigned on September 20, 2007. When Ms. Gilseth resigned, consistent with A.G. Edwards' policy and procedure, Edwards management immediately reassigned her accounts to the remaining brokers in the office. Those remaining brokers included Kelly Stromgren. Thus, when Edwards received the transfer request from Gilseth's client, Edwards' internal records had already been changed to identify Stromgren as the broker-of-record. That is why that Edwards document identified Stromgren, and not Gilseth, as the broker-of-record.

This possibility was readily apparent when Edwards presented this evidence to the Court, yet Edwards had failed to conduct a simple inquiry to determine whether the client in question had always been a Stromgren client (as represented) or whether the client had been served by one of the brokers who had recently departed (i.e., Gilseth or Slayden). All Edwards had to do was to look at its computerized copy of the client's account statement for the end of the

preceding month(s). Doing so would have shown Edwards that the client's financial consultant had long been Gilseth, not Stromgren.

Plaintiff further misled the Court on October 10 when it argued that its proposed TRO would somehow serve to hold Defendants to their contracts. What Plaintiff did not explain is that three of the four Defendants – i.e., the three brokers – signed an employment agreement that *did not prohibit post-employment solicitation of Edwards clients*. Thus, three of the Defendants remain enjoined from contacting their former clients even though their employment agreements do not contain any non-solicitation clause.

Finally, to the extent that the Court issued the TRO based on its concern about the client documents that were taken by Defendants, those concerns are now moot. In the past three weeks, Defendants have surrendered to Plaintiff almost all of the documents that they took when they left Edwards, with the result that they can no longer use them for any purpose.

For these reasons, and others to follow, Defendants respectfully request that the Court modify the TRO in a single respect -- by vacating the portion of the TRO that prohibits Defendants Slayden, Gilseth, and Stromgren from soliciting clients whom they served while employed by A.G. Edwards.

## II.

## FACTUAL BACKGROUND

### A. The Events That Led to Defendants' Departure From A.G. Edwards

On May 31, 2007, Wachovia Corporation announced that it would acquire A.G. Edwards. That acquisition has profound implications for A.G. Edwards' employees. Wachovia intends to merge Edwards' operations into its own, and A.G. Edwards will soon cease to exist.

Slayden, Gilseth, and Stromgren are typical of the many Edwards' brokers who were faced with a difficult decision upon learning of the merger. There can be no dispute as to their loyalty to Edwards – Slayden joined Edwards in or about 1984, Gilseth in or about 1986, and Stromgren in or about 1996. *See* Declaration of Sam Slayden in Support of Motion to Modify TRO at ¶ 1 ("Slayden Decl."); Declaration of Denise Gilseth in Support of Motion to Modify TRO at ¶ 1 ("Gilseth Decl."); Declaration of Kelly Stromgren in Support of Motion to

Modify TRO at ¶ 1 ("Stromgren Decl."). McJilton, a financial associate who worked primarily as an assistant to Slayden, had been with Edwards since about 1988. Declaration of Cathy McJilton in Support of Motion to Modify TRO at ¶¶ 1,4 ("McJilton Decl."). Each of them was a happy and productive Edwards employee, who, on May 31, 2007, realized that his/her employer would soon cease to exist.

### B.  Defendants' Departure From A.G. Edwards

Slayden resigned from Edwards on September 20, 2007 and joined Stifel that same day. Slayden Decl. at ¶ 7. Gilseth and McJilton did the same. Gilseth Decl. at ¶ 9; McJilton Decl. at ¶ 5. Stromgren resigned from Edwards and joined Stifel on October 1. Stromgren Decl. at ¶ 6.

All of the Defendants handled their resignations professionally, honorably, and in accordance with the securities industry custom and practices they learned and observed while employed by A.G. Edwards. Prior to resigning from Edwards, none of the Defendants told a single one of their clients that they were moving to Stifel. Slayden Decl. at ¶ 8; Gilseth Decl. at ¶ 17; McJilton Decl. at ¶ 6; Stromgren Decl. at ¶ 8. Nor did any of the Defendants, prior to resigning from Edwards, attempt to solicit any of their colleagues to join them at Stifel. Slayden Decl. at ¶ 13; Gilseth Decl. at ¶ 20; McJilton Decl. at ¶ 6; Stromgren Decl. at ¶ 12. Contrary to Plaintiff's allegations, each of the Defendants made an independent decision to leave Edwards and to join Stifel. Slayden Decl. at ¶¶ 5,6, 13; Gilseth Decl. at ¶¶ 5,6; McJilton Decl. at ¶ 4; Stromgren Decl. at ¶ 7. In particular, Slayden and Gilseth each made an independent decision to leave Edwards and to join Stifel. Slayden Decl. at ¶ 13a; Gilseth Decl. at ¶ 6. In addition, long before Slayden decided to join Stifel, McJilton had decided that she would not join Wachovia, and that she would follow her long-time boss to whatever new employer he might join if he decided to go elsewhere. McJilton Decl. at ¶ 4.

In departing from Edwards, Slayden, Gilseth, and Stromgren took documents that they believed would be useful to serve their clients in the future, should those clients choose to

transfer their accounts to Stifel.[1] Gilseth Decl. at ¶ 15; Gilseth Decl. at ¶ 9; Stromgren Decl. at ¶ 15. McJilton, as a financial associate, took no documents at all. McJilton Decl. at ¶ 5. Moreover, Slayden, Gilseth, and Stromgren scrupulously waited until their license registration transferred to Stifel before informing any clients about their move. Slayden Decl. at ¶ 11; Gilseth Decl. at ¶ 19; Stromgren Decl. at ¶ 11. Because of her limited duties, McJilton never initiated contact with any clients about her move to Stifel. McJilton Decl. at ¶ 6.

### C.  Procedural Background

Plaintiff filed this action on October 9, 2007, along with an ex parte application for a broad TRO. On October 10, 2007, this Court heard argument on that application. Because of the short notice, Defendants did not have sufficient time to prepare and submit sworn declarations.[2] On a limited factual record, the Court granted a limited TRO. That TRO (1) prohibits Defendants from soliciting or initiating contact with any current Edwards clients, but (2) permits Defendants to communicate with former Edwards clients who have already transferred their accounts to Stifel, as well as current Edwards clients who independently initiate contact with Defendants. Declaration of Kenneth C. Mennemeier, Ex. 2, Transcript of Proceedings ("Hearing Transcript") at 37:20-24; 39:23-40:5.

This Court issued the TRO in anticipation that there would be an expedited arbitration hearing and a prompt decision whether the actual facts and circumstances warranted a permanent injunction. *See* Hearing Transcript at 4:5-7 (representation by Plaintiff that "within 15 days from the injunction, under the [FINRA] rules, the arbitration panel convenes and

---

[1] Each of the Defendants has since returned virtually all of the documents s/he took when s/he left. The exceptions are: (1) a redacted document that contains only client names and phone numbers; (2) in Gilseth's case, information off of her Microsoft Outlook Contacts file; and (3) in Stromgren's case, an electronic file containing client names, contact information, and basic information about their accounts. Those materials are addressed in Section III(C) of this memorandum.

[2] Plaintiff filed this action on Tuesday, October 9, 2007, a date on which it (and its counsel) knew that Defendants' counsel would be in St. Louis, Missouri, attending the deposition of Stifel's CEO, which A.G. Edwards was taking in another case that it had filed against another departed A.G. Edwards employee (*i.e.*, *A.G. Edwards v. John Lee*, Sacramento Superior Court, Case No. 07AS03926) (TRO and preliminary injunction denied). Mennemeier Decl. ¶ 9.

considers the issue of injunctive relief"). In particular, this Court contemplated that the TRO would be reviewed by FINRA arbitrators after approximately 15 days:

> So this [TRO] is just for 15 days until you get before FINRA, and FINRA can fix it up any way that's right; but in my judgment, whatever rights the plaintiff is going to be able to establish will completely have been evaporated in 15 days, so the further solicitation will stop of clients for 15 days. Well, until such time as FINRA or this Court modifies its – I'm basing this – I'm saying 15 days only because that's what counsel have told me.

Hearing Transcript at 42:3-10. The Court also invited Defendants to return with a motion to vacate the TRO should delays occur in connection with the expedited arbitration hearing.

> All those arbitration outfits – they are delay city. And if there's delay city involved here because the plaintiff has gotten some relief and wants to drag it out, I'm going to vacate the order. So it's – the burden is on the plaintiff to get in there and get this arbitration going, and to stop the delay city.

Hearing Transcript at 42:11-16. Pursuant to the Court's invitation, Defendants now ask the Court to modify the TRO that the Court issued on October 10, 2007.[3]

### III.

### ARGUMENT

**A.  As Defendants Cannot Obtain an Expedited Review of the TRO from FINRA Arbitrators, this Court Should Modify the TRO, Just as the Court Anticipated During the October 10, 2007 Hearing.**

**1.  Due to the Plaintiff's Stalling Tactics and the Unavailability of the FINRA Arbitrators, the Arbitration Hearing Will Not Conclude Until November 17, 2007 at the Earliest.**

On October 10, this Court issued a TRO in anticipation that FINRA arbitrators would hold an expedited evidentiary hearing and review the injunction against Defendants in approximately fifteen days. *See* Hearing Transcript at 4:5-7; 42:3-10. At the same time, however, the Court noted that: (1) FINRA arbitration might turn into "delay city," and

---

[3] As for modification, Defendants ask only that the Court lift the portion of the TRO that prohibits them from contacting the clients whom they served while employed by A.G. Edwards.

(2) Plaintiff may attempt to "drag out" the proceedings once a TRO was in place against Defendants. *See* Hearing Transcript at 42:11-16. Not surprisingly, the Court's predictions have come to pass:

- By stipulation of the parties, the arbitration hearing began on October 29.[4] But, in setting the matter to commence on October 29, FINRA gave the parties only two hearing days. Mennemeier Decl. at ¶ 3.[5]

- With the knowledge that only two days were available for the hearing, Plaintiff made no effort to plan its case-in-chief accordingly. On October 26, for example, Plaintiff's counsel notified Defendants that it intended to call no fewer than twenty-eight named witnesses, in addition to ten categories of additional witnesses. Mennemeier Decl., ¶ 4c, Ex. C.

- On October 29, Plaintiff began its case-in-chief by calling three non-party witnesses: (1) Christian Amador, a Stifel wire operator, (2) Jamie Van Heusen, a part-time Stifel administrative assistant, and (3) John Lee, a Stifel Senior Vice President and Managing Director. Mennemeier Decl., ¶ 5a. Plaintiff's examinations of the three non-party witnesses did not conclude until approximately noon on the second day of hearing. *Id.*.

- It was not until the afternoon of October 30 that Plaintiff called its first *party* witness, Defendant Cathy McJilton. Mennemeier Decl., ¶ 5b. It was not until about 3:30 p.m. of that day that Plaintiff finally called a broker as a witness – Defendant Kelly

---

[4] Defendants have no objection to the fact that the hearing commenced 19 days after the Court issued its TRO, rather than 15 days; that four day delay occurred upon the parties' stipulation.

[5] On October 23, 2007, just days before the scheduled commencement of the hearing, Plaintiff attempted to delay the hearing even further by moving, on frivolous grounds, to disqualify two of the three arbitrators. Specifically, Plaintiff moved to strike one arbitrator on the ground that he is currently employed by Smith Barney, a division of Citigroup, Inc., which is the parent company of another subsidiary which is claimed to be a client of Plaintiff's counsel, Paduano & Weintraub LLP. Plaintiff also moved to strike another arbitrator on the ground that he was hired by Plaintiff's co-counsel, Keesal, Young & Logan, as an expert witness in a single, unspecified, and unrelated matter seven years ago. Mennemeier Decl., ¶ 4b, Ex. C. FINRA's Director of Arbitration denied that challenge on October 25, 2007.

Stromgren. *Id.* This examination did not conclude as of the close of the second day of hearing. *Id.*

Thus, by the end of the day on October 30, Defendants had completed the examination of only one of the four Defendants, and none of the brokers. Mennemeier Decl., ¶ 5c. Moreover, Defendants had no opportunity to present their own case-in-chief. *Id.* As of the date of this motion, the two principal Defendants – branch manager Slayden and assistant manager Gilseth – have still not had the opportunity to present their story to any fact-finder.

- Due to the arbitrators' calendar, the arbitration hearing will not resume until November 15, and then only for two additional days. Mennemeier Decl., ¶ 6.

As a result, the FINRA arbitrators will not issue a ruling as to whether the TRO against Defendants should be dissolved until, at the soonest, *more than five weeks* after the TRO was issued.[6] By November 16, the TRO will have been in place for a total of 37 days, far longer than appropriate under Federal Rule of Civil Procedure 65.

### 2. To the Extent that the Court Issued the TRO to Protect A.G. Edwards' Right to Fair Competition, Edwards No Longer Requires Such Judicial Protection.

In issuing the TRO, the Court notified Plaintiff that it was disinclined to permit the injunction to stay in place for more than fifteen days. That is because, "in [the Court's] judgment, whatever rights the plaintiff is going to be able to establish will completely have been evaporated in 15 days." Hearing Transcript at 39:10-11. The Court was absolutely correct in that regard. Even if a TRO was originally warranted to protect Edwards' right to fair competition (and Defendants maintain that it was not), Edwards is no longer in need of such protection.

Since October 10, Plaintiff has been largely insulated from competition from Defendants. In particular, Plaintiff has had ample opportunity to contact the clients whose

---

[6] NASD Rule 13904(d), which governs FINRA arbitration, provides: "The panel shall endeavor to render an award within 30 business days from the date the record is closed." Request for Judicial Notice in Support of Defendants' Motion to Modify Temporary Restraining Order, Exhibit A. Waiting an additional 30 business days would mean another six weeks of delay.

accounts Defendants previously serviced and explain the benefits of having their accounts at Wachovia even though their brokers have moved to another firm. Defendants, in the meanwhile, have been unable to contact those clients, and to offer competing information about Stifel. Thus, for the past three weeks, Plaintiff has had more than a fair opportunity to compete for the business of those clients.

At this point, keeping the TRO in place would not promote fair competition or save Plaintiff from irreparable harm. Instead, keeping the TRO in place would serve to continue insulating Plaintiff from legitimate competition from Defendants. Moreover, keeping the TRO in place would serve to injure innocent third-parties: clients who were serviced by Slayden, Gilseth, and Stromgren. As consumers of financial services, those clients are entitled to receive information from their former financial consultants in order to make an informed decision as to the broker and/or brokerage firm with which they wish to place their business. However, those clients are currently being prevented from obtaining such information due to the TRO.[7] For these reasons alone, this Court should modify the TRO so as to permit Slayden, Gilseth, and Stromgren to contact those third-party clients.

**B.     At the October 10 Hearing, Plaintiff Misrepresented its Evidence.**

The Court should modify its TRO for a separate and independent reason: the Court issued the TRO based on several factual misrepresentations made by Plaintiff at the October 10th hearing.

**1.     The Defendants Did Not Solicit Clients to Transfer Their Accounts Prior to Resigning from A.G. Edwards.**

During the October 10 hearing, Plaintiff claimed to have evidence that Defendants solicited clients to join them at Stifel even before they resigned from Edwards. Specifically, Plaintiff pointed to an internal Edwards document that indicated that a client – supposedly

---

[7] Some of those clients are elderly or otherwise dependent on their brokers to initiate contact with them in connection with any developments relating to their accounts. *See* Gilseth Decl. at ¶ 16. Those clients are particularly threatened by the cutting off of communications between them and their trusted, former financial consultants.

Stromgren's – had submitted forms to transfer her account to Stifel on September 28, 2007. *See* Declaration of William Hatcher in Support of Plaintiff's Application for TRO, Exhibit I. Plaintiff presented that form as evidence that Stromgren had solicited clients to join her at Stifel prior to her resignation from Edwards on October 1, 2007. *Id.* at ¶ 43; Hearing Transcript at 7:3-7.

However, there is a simple and innocent explanation for that form. The account reflected on that form actually belonged to a long-time client of *Denise Gilseth*. Gilseth Decl. at ¶ 18. When Gilseth resigned from Edwards on September 20, Edwards reassigned her accounts to other brokers, including Stromgren. Stromgren Decl. at ¶ 9. One of those accounts belonged to the client reflected on that form. *Id.*

On September 28, Edwards received a document by which that client requested a transfer of her accounts to Stifel. Gilseth Decl. at ¶ 18. Thus, the September 28 form actually reflected one of *Gilseth's clients* transferring out of Edwards in order to follow Gilseth to Stifel – *not* one of Stromgren's clients. Gilseth Decl. at ¶ 18; Stromgren Decl. at ¶ 9. In fact, Stromgren has never served that client, much less solicited her to transfer to Stifel. Stromgren Decl. at ¶ 9. Indeed, William Hatcher – the Edwards Pacific Regional Manager whose declaration introduced the form – admitted that the form was subject to such an innocent explanation. Mennemeier Decl. at ¶ 8, Ex. D, Transcript of Deposition of William Hatcher on October 19, 2007 ("Hatcher Transcript"), at 74:20-77:25.

That Plaintiff would present that form to the Court as evidence of wrongdoing by Stromgren (much less all of the Defendants) is reckless at best. With a few computer keystrokes, Plaintiff could have easily determined that the client from whom Edwards received the account transfer form on September 28 was actually a longtime client of Gilseth, not Stromgren. Gilseth Decl. at ¶ 18; Stromgren Decl. at ¶ 9. However, neither Hatcher, nor anyone Hatcher is aware of, made any effort to investigate the facts before presenting them to the Court. *See* Hatcher Transcript at 84:13-85:12. Moreover, there is no evidence that any of the other Defendants solicited any clients to join Stifel prior to their resignation from Edwards. Thus, Edwards'

alleged "evidence" of pre-resignation solicitation was false for Stromgren and non-existent for Slayden and Gilseth.

### 2. Slayden, Gilseth, and Stromgren Have No Contractual Duty to Refrain From Soliciting Clients They Previously Served at A.G. Edwards.

But that was not the only respect in which Plaintiff misled the Court during the October 10 hearing. Plaintiff also argued that a TRO was necessary in order to "to preserve the status quo" (Hearing Transcript at 3:24) and to "hold [Defendants] to their contracts until such time as we get before the arbitrators" (*id.* at 11:5-6). In so arguing, Plaintiff misrepresented what the status quo actually was with respect to Defendants' contractual obligations.

Although Defendants Slayden, Gilseth, and Stromgren each signed an employment agreement at Edwards, *none of those agreements prohibits them from soliciting clients they served at Edwards after they leave the firm.* Hatcher Decl., Exs. A-D; *see also* Hatcher Depo Transcript at 63:19-23 (admitting his understanding that "Edwards' contracts for financial consultants do not prohibit those financial consultants from soliciting clients they served at Edwards after they leave Edwards"). The absence of a non-solicitation clause in these agreements is purposeful, and consistent with the message that Edwards has always sent to its brokers: "You are free to leave at any time and to take your clients with you." In his October 19, 2007 deposition, Edwards regional manager William Hatcher testified that it was Edwards's policy that departed Edwards brokers are free to solicit clients whom they served at Edwards, in the absence of a contract to the contrary. *See* Hatcher Transcript at 100:7-11. Moreover, A.G. Edwards' senior management repeatedly told A.G. Edwards brokers (including Defendants) that the brokers – rather than the firm – owned their client relationships.[8] It would be meaningless to say that the broker – and not Edwards – "owns" the client relationship if departing brokers cannot

---

[8] One example is an email memo sent by Gene Diederich, the Director of Branches at A.G. Edwards, on June 26, 2007. Declaration of James Lee in Support of Defendants' Opposition to TRO Application, Ex. A. In that memo, Diederich compared Wachovia's culture with that of A.G. Edwards, and said: "*Wachovia Securities shares our belief that the FC [Financial Consultant], not the firm, owns the client relationship.*" *Id.* (Emphasis added.)

445.03.PLE.Modify.TRO.P's&A's.wpd                                11
POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO MODIFY TRO

even advise their clients that they have joined a new firm. Indeed, Defendants are not aware of any instance in the past in which Edwards commenced litigation when a departing broker took information about his/her clients. *See* Slayden Decl. at ¶ 17; Gilseth Decl. at ¶ 11; Stromgren Decl. at ¶ 17.

The agreements signed by Slayden, Gilseth, and Stromgren stand in contrast to the "Financial Associate Agreement" that Cathy McJilton signed in 2000. Paragraph 30 of McJilton's agreement contains a clause prohibiting financial associates (i.e., brokers' assistants) from soliciting customers after their departure from Edwards.[9] Hatcher Decl., Exhibit E. The presence of a non-solicitation clause in McJilton's agreement is revealing. In particular, the presence of such a clause in McJilton's agreement shows that (1) Edwards knows how to include such a clause in its employment agreements, and (2) the absence of the same clause in the brokers' agreements is purposeful. Although it makes motivational sense for Edwards to give brokers the freedom to take their clients with them when they leave Edwards, it makes far less sense for Edwards to give administrative assistants the same freedom. *See* Hatcher Transcript at 62:9-18 (admitting that "the reason for the inclusion of that clause in a contract for registered financial associate is because Edwards does not want such persons to serve in that role assisting brokers and getting introduced to a broker's book of business and then leaving A.G. Edwards for a competitor to solicit the broker's book of business while the broker remains at A.G. Edwards").

In short, the evidence – Defendants' declarations, Hatcher's deposition testimony, Deiderich's e-mail, and Defendants' various employment agreements – all paint the same picture: brokers at Edwards were consistently told that they own their client relationships, and that they are free to continue business with those clients even if they were to leave Edwards. Thus, Defendants had no contractual obligation to refrain from soliciting clients they previously served at Edwards. Thus, the TRO altered, rather than preserved, the status quo as of October 10, 2007.

---

[9] McJilton has not solicited any Edwards customers since working for Stifel, and therefore has not violated that clause. McJilton Decl. at ¶ 7.

### C. The TRO Should Be Lifted Because Defendants Have Surrendered the Documents They Retained When They Departed From Edwards.

During the October 10, 2007 hearing, the Court expressed concern about "the volume of information that was taken" by Defendants when they left Edwards. Hearing Transcript 38:8. Defendants vigorously dispute that the information they retained upon resignation constitutes trade secret or proprietary material. But even if it did, a TRO in connection with those materials is no longer necessary, because each of the Defendants has since returned virtually all of the documents he/she took when he/she left. Because Defendants have surrendered nearly all of the information and documents, there is no threat that Defendants will read, use, or otherwise rely upon those material. *See Carribean Marine Sers. Co. v. Baldrige*, 844 F.2d 668, 673 (9th Cir. 1988) ("a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief") (italics in original).

At this time, the only documents that Defendants retain are: (1) a redacted document that contains client names and phone numbers ("Redacted Browse List"); (2) in Stromgren's case, an electronic spreadsheet file containing client names, contact information, and basic information about their accounts; and (3) in Gilseth's case, information off of her Microsoft Outlook Contacts file. Slayden Decl. at ¶ 19; Gilseth Decl. at ¶ 13; Stromgren Decl. at ¶ 19. For the following reasons, it is unnecessary for the Court to issue a TRO restraining Defendants from soliciting their clients based upon the use of any of these materials.

#### 1. Redacted Browse List

As to the redacted Browse Lists, the only information contained therein are the names of clients that Defendants personally serviced along with their telephone numbers. The case law is clear that departing employees may retain such information. In *Moss, Adams & Co. v. Shilling*, 179 Cal. App. 3d 124 (1986), the court ruled that the names of customers of an accounting firm that were known by the employees because they had personally provided services for those customers did not constitute a trade secret. Similarly, in *Scott v. Snelling & Snelling, Inc.*, 732 F. Supp. 1034 (N.D. Cal. 1990), the court found that customer lists are not trade secrets where the former employee "developed the customer lists through their own efforts,

personal knowledge, and business contacts." In such circumstances, the California courts have repeatedly held that a customer list does not constitute a trade secret for the purposes of enforcing a covenant restraining competition because 'equity has no power to compel a man who changes employers to wipe clean the slate of his memory.'" *Id.* at 1044. And, because the names of customers are not trade secrets, contact information for those customers is also not a trade secret. *Moss, Adams & Co.*, 179 Cal. App. at 129.

   Separate and apart from *Moss, Adams & Co.*, Plaintiff cannot claim a proprietary interest in such basic customer information under the doctrines of waiver and estoppel. By its prior representations and practices, Plaintiff consistently told Defendants that they were free to continue doing business with the clients they serviced at Edwards even if they were to go to another firm. Implicit in those representations is a promise that departing brokers may take with them basic information that they need in order to do business with those clients. Indeed, as previously stated, Defendants are not aware of any prior instance in which Edwards commenced litigation when a departing broker took documents with him documents.

### 2. Defendant Stromgren's Electronic Spreadsheet File

   Stromgren currently retains on her computer two spreadsheet files containing client names, contact information, and basic information about their accounts. Stromgren Decl. at ¶ 19. No TRO is necessary as to these computer files, because she is prepared to permanently delete those files as soon as she is permitted to do so. *Id.* The reason Stromgren has not already deleted those files is that this Court had instructed the parties not to destroy any evidence as part of the TRO. *Id.*[10]

---

[10] Stromgren would like the Court's permission to delete these files from her computer. An electronic copy of these files has already been produced in discovery.

### 3. Defendant Gilseth's Electronic Spreadsheet File

Gilseth currently retains on her office computer an electronic Microsoft Outlook Contacts file.[11] Gilseth Decl. at ¶ 13. For over ten years, Gilseth has been using that Outlook file as a combination of a Rolodex and a notepad. *Id.* at ¶ 14. Thus, that Outlook file contains the address and phone numbers of Gilseth's business contacts, as well as her notes of conversations with them. *Id.*

The business contacts contained in Gilseth's Outlook file fall into three categories: (1) non-client contacts (e.g., various referral sources and prospects); (2) clients she served at Edwards who have already transferred their accounts to Stifel; and (3) clients she served at Edwards whose accounts currently remain at Edwards. *Id.*

As to the first category of contacts (i.e., non-clients), Gilseth is clearly entitled to retain the Microsoft Outlook data pertaining to those persons. The same is true of the second category of contacts (i.e., current Stifel clients), as those persons have already evinced a desire for Gilseth to serve them as their broker. It can be safely assumed that those clients fully consent to Gilseth's possession of notes from their prior conversations.

As to the third category of contacts (i.e., clients formerly serviced by Gilseth whose accounts remain at A.G. Edwards), Gilseth is entitled to retain her Outlook data as to those persons as well. Gilseth's right to have basic contact information about those persons (such as the phone numbers and addresses) is protected under *Moss Adams*. In addition, Gilseth's notes of her prior conversations with those clients are not proprietary or confidential to Edwards, as they were gathered and maintained by Gilseth. If Gilseth really owns her relationship with her clients, as Edwards has consistently said, then Gilseth should be able to retain her self-created record of that relationship. However, if the Court remains concerned about

---

[11] Certain information in that Contacts file was copied from the Contacts file that Gilseth had on her computer at A.G. Edwards. Importantly, Gilseth merely copied that information; she never deleted it from her Edwards computer or otherwise deprived Edwards of access to the same information.

Gilseth's retention of those notes, and if the Court wants Gilseth to remove those notes from her computer as a condition to allowing her to contact her former clients, she will do so immediately.

### IV.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court modify the TRO that it issued on October 10, 2007 such that Slayden, Gilseth, and Stromgren would be permitted to solicit the clients they previously serviced at A.G. Edwards.

Dated: November 7, 2007

MENNEMEIER, GLASSMAN & STROUD LLP
KENNETH C. MENNEMEIER
STEPHEN LAU

By: _____
Kenneth C. Mennemeier, Attorneys for Defendants
Samuel Slayden, Denise Gilseth, Cathy McJilton, and Kelly Stromgren

Case Name: *A.G. Edwards & Sons, Inc. v. Slayden, et al.*
Case No.: U.S. District Court, Northern District of California, Case No. 07-CV-05154 WHA

# PROOF OF SERVICE

I declare as follows:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 980 9th Street, Suite 1700, Sacramento, California 95814. On November 7, 2007, I served the within documents:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO MODIFY TEMPORARY RESTRAINING ORDER**

☒ by placing the document(s) listed above in a sealed Federal Express envelope and affixing a pre-paid air bill, and delivering to a Federal Express agent for delivery.

**ANTHONY PADUANO**
**PADUANO & WEINTRAUB LLP**
**1251 AVENUE OF THE AMERICAS**
**NINTH FLOOR**
**NEW YORK, NEW YORK 10020**
**FACSIMILE: 212.785.9099**

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepared in the ordinary course of business.

☒ I declare that I am employed in the office of a member of the bar of this Court at whose direction this service was made.

Executed on November 7, 2007, at Sacramento, California.

*Angela Knight*
Angela Knight