1  MENNEMEIER, GLASSMAN & STROUD LLP
   KENNETH C. MENNEMEIER (SBN 113973)
2  STEPHEN LAU (SBN 221051)
   980 9th Street, Suite 1700
3  Sacramento, CA 95814
   Telephone: (916) 553-4000
4  Facsimile: (916) 553-4011

5  Attorneys for Defendants
   Samuel Slayden, Denise Gilseth,
6  Cathy McJilton, and Kelly Stromgren

7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  A.G. EDWARDS & SONS, INC.,          )  CASE NO: C 07-05154 WHA
                                        )
12          Plaintiff,                  )  **DECLARATION OF KENNETH C.**
                                        )  **MENNEMEIER IN SUPPORT OF**
13  v.                                  )  **DEFENDANTS' MOTION TO MODIFY**
                                        )  **TEMPORARY RESTRAINING ORDER**
14  SAMUEL SLAYDEN, DENISE GILSETH, )
    CATHY MCJILTON, and KELLY           )  Date:      November 9, 2007
15  STROMGREN,                          )  Time:      tba
                                        )  Courtroom: 9
16          Defendants.                 )
                                        )  Complaint Filed:   October 9, 2007
17  _____ )  TRO Issued:        October 10, 2007

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF KENNETH C. MENNEMEIER

I, Kenneth C. Mennemeier, declare as follows:

1.    I am an attorney licensed to practice law in the State of California and before this Court. I am a partner in the law firm of Mennemeier, Glassman & Stroud, LLP, counsel for Defendants in this matter.

2.    Attached hereto as Exhibit A is a true and correct copy of the transcript of the proceedings that occurred before this Court on October 10, 2007.

3.    After the Court issued a TRO, the parties proceeded in arbitration before the Financial Industry Regulatory Authority ("FINRA"). By stipulation of the parties, the arbitration hearing began on October 29. But, in setting the matter to commence on October 29, FINRA gave the parties only two hearing days.

4.    Even before the hearing commenced, Plaintiff engaged in conduct that created the impression that it did not want to finish the arbitration hearing promptly and in fact wanted to delay proceedings:

a.    First, after having told FINRA that it was available for two days commencing October 29, Edwards' counsel later said that he would not be available on October 30;

b.    Second, on October 23, 2007, just six days before the scheduled commencement of the hearing, Plaintiff moved to disqualify two of the three arbitrators. Specifically, Plaintiff moved to strike one arbitrator on the ground that he is currently employed by Smith Barney, a division of Citigroup, Inc., which is the parent company of another subsidiary which is claimed to be a client of Plaintiff's counsel, Paduano & Weintraub LLP. Plaintiff also moved to strike another arbitrator on the ground that he was hired by Plaintiff's co-counsel, Keesal, Young & Logan, as an expert witness in a single, unspecified, and unrelated matter seven years ago. A copy of Plaintiff's letter to FINRA challenging those arbitrators is attached as Exhibit B. FINRA's Director of Arbitration denied that challenge on October 25, 2007.

c.    Third, on Friday October 26, 2007, Edwards presented a witness list identifying at least 28 potential witnesses. A copy of Edwards' witness list is attached as

1   Exhibit C. This letter appeared to be another apparent attempt to inflict and justify delay into the

2   proceedings.

3           5.      Edwards then proceeded to conduct the hearing in a manner designed to

4   assure that the Panel could not hear the issues within the allotted two days.

5                   a.      On October 29, Plaintiff began its case-in-chief by calling three

6   non-party witnesses: (1) Christian Amador, a Stifel wire operator, (2) Jamie Van Heusen, a part-

7   time Stifel administrative assistant, and (3) John Lee, a Stifel Senior Vice President and

8   Managing Director. Plaintiff's examinations of the three non-party witnesses did not conclude

9   until approximately noon on the second day of hearing.

10                  b.      It was not until the afternoon of October 30 that Plaintiff called its

11  first *party* witness, Defendant Cathy McJilton. It was not until about 3:30 p.m. of that day that

12  Plaintiff finally called a broker as a witness – Defendant Kelly Stromgren. By the end of the

13  second hearing day, Plaintiff still had not concluded its examination of Stromgren -- the first and

14  only broker that Plaintiff called to testify in two days of hearings.

15                  c.      By the end of the day on October 30, Defendants had completed

16  the examination of only one of the four Defendants (Cathy McJilton), and none of the brokers.

17  Moreover, Defendants had no opportunity to present their own case-in-chief.

18          6.      When the Panel adjourned the hearing, Defendants offered to appear so

19  that the hearing could continue on Wednesday, October 31. Defendants asked that the hearing

20  continue on consecutive days until completed. But, the Panel was not immediately available

21  beyond those first two hearing days. Due to the arbitrators' calendar, the arbitration hearing will

22  not resume until November 15, and then only for two additional days (November 15-16).

23          7.      By November 16, the TRO will have been in place for a total of 37 days.

24  Even then there will be no assurance of a prompt decision. Even if the hearing is completed on

25  November 16, FINRA's rules allow the Panel 30 *business* days to make a decision. FINRA Rule

26  13904(d) provides: "The panel shall endeavor to render an award within 30 business days from

27  the date the record is closed."

28

1    8.    I deposed Edwards' declarant, William Hatcher, on October 19, 2007.

2  Relevant and cited pages from his deposition transcript are attached hereto as Exhibit D.  In

3  deposition, Mr. Hatcher testified that:

4    a.    Exhibit I to his declaration -- an internal Edwards form purporting

5  to show that Kelly Stromgren solicited clients to transfer their accounts before she resigned from

6  Edwards on October 1, 2007 -- was subject to a simple and innocent explanation, i.e., that the

7  client may simply have been a Gilseth or Slayden client whom Edwards management had

8  reassigned to Stromgren upon Gilseth's and Slayden's departure.

9    b.    Neither Hatcher nor anyone else at Edwards had made any effort to

10  investigate the facts before presenting them to the Court, i.e., to determine whether the client

11  whose account was the subject of Hatcher's Exhibit I had been served by Gilseth rather than

12  Stromgren.

13    c.    "Edwards' contracts for financial consultants do not prohibit those

14  financial consultants from soliciting clients they served at Edwards after they leave Edwards."

15    d.    · It was Edwards's policy that departed Edwards brokers are free to

16  solicit clients whom they served at Edwards, in the absence of a contract to the contrary.

17    9.    Plaintiff filed this action on Tuesday, October 9, 2007, a date on which it

18  (and its counsel) knew that I would be in St. Louis, Missouri, attending the deposition of Stifel's

19  CEO, which A.G. Edwards was taking in another case that it had filed against another departed

20  A.G. Edwards employee (*i.e.*, *A.G. Edwards v. John Lee*, Sacramento Superior Court, Case No.

21  07AS03926) (TRO and preliminary injunction denied).

22    I declare under the penalty of perjury under the laws of the United States and

23  under the laws of the State of California that the foregoing is true and correct.  Executed in

24  Sacramento, California, on November 7, 2007.

25

26    _Kenneth C. Mennemeier_
       Kenneth C. Mennemeier

27

28

# EXHIBIT A

071010_WHA_2

Volume 1

Pages 1 - 43

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

A.G. EDWARDS & SONS, INC.,      )
                                )
        Plaintiff,              )
                                )
    VS.                         ) NO. C-07-05154-WHA
                                )
SAMUEL SLAYDEN, DENISE GILSETH, )
CATHY MCJILTON, and KELLY       )
STROMGREN,                      )
                                ) San Francisco, California
        Defendants.             ) Wednesday
                                ) October 10, 2007
_____) 1:10 p.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:    PADUANO & WEINTRAUB LLP
                  1251 Avenue of the Americas
                  Ninth Floor
                  New York, New York  10020
                  (212) 785-9100
                  (212) 785-9099 (fax)
                  BY:  ANTHONY PADUANO

For Defendants:   Mennemeier, Glassman & Stroud LLP
                  980 9th Street, Suite 1700
                  Sacramento, CA  95814
                  (916) 553-4000
                  (916) 553-4011 (fax)

Page 1

071010_WHA_2

24  to bind -- you want to hold them to the protocol without you

25  being part of the protocol. That's unconscionable. Here.

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

32

1  Come take this offending document back. This -- this is

2  terrible, what you're trying to do. That's as bad as what

3  Counsel was trying to do, to make me think provisions were in

4  the contract. You're trying to make me believe that that

5  protocol applies in this case.

6      MR. MENNEMEIER: Your Honor, I'm sorry if I did not

7  make myself clear.

8      THE COURT: Well, you sure didn't. All right. Have

9  a seat. I'm ready to rule. Time has run out.

10      Here's what we're going to do. All right. I'm going

11  to give some relief, but not as much as everybody wants.

12      First of all, there's going to be two depositions per

13  side, up to one day. And this is all going to take place

14  before the 15-day time fuse runs out. So if you need to come

15  back in here and get more relief based on the depositions,

16  fine.

17      So since you're the plaintiff, you get to take your

Page 40

071010_WHA_2

18 two depositions first. Who do you want to take?

19    MR. PADUANO: Your Honor, we'll take -- may we take

20 Mr. Slayden's deposition and, your Honor --

21    THE COURT: Slayden.

22    MR. PADUANO: Mr. Slayden, your Honor.

23    THE COURT: Who else?

24    MR. PADUANO: I don't want to ask the Court to

25 reserve, but I believe I want to take the person at Stifel,

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

33

1 Nicolaus who hired Mr. Slayden.

2    THE COURT: Who is that?

3    THE COURT: All right. Who is it, back there?

4    MR. HUGHES: I think Mr. Mennemeier knows.

5    MR. MENNEMEIER: I believe it's a man by the name of

6 John Lee.

7    THE COURT: Lee?

8    MR. MENNEMEIER: John Lee.

9    THE COURT: All right. So Slayden is going to be

10 deposed Friday this week, starting at 9:00 a.m. Where do you

11 want that deposition to take place?

071010_WHA_2

12     MR. PADUANO:  At the office of Keesal, Young & Logan,

13 your Honor, if that's --

14     THE COURT:  Where is that?

15     MR. PADUANO:  Four Embarcadero.

16     THE COURT:  Where does Mr. Slayden live?

17     MR. MENNEMEIER:  He works in Santa Rosa.  I don't

18 know what his residence is, but I believe it's Sonoma County.

19     THE COURT:  All right.  That's close enough.  He can

20 come to that office.  9:00 a.m.  Okay.  We'll come back to

21 documents in a minute.

22     Mr. Lee will be deposed on Monday, 9:00 a.m., same

23 place.

24     MR. MENNEMEIER:  Now, Mr. Lee, your Honor, lives in

25 Auburn/Sacramento area.

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

34

1     THE COURT:  Well, your office -- your office is in

2 Sacramento.  All right.  We'll take his deposition in

3 Sacramento.  So we'll take that -- you take the deposition in

4 Mr. Mennemeier's office Monday, 9:00 a.m.

5     Okay.  Mr. Mennemeier, what deposition do you want to

Page 42

071010_WHA_2

6  take?

7      MR. MENNEMEIER:  May I have just a second,

8  your Honor?

9      Your Honor, I would like the deposition of

10  Gene Diederich, director of branch operations.

11      THE COURT:  Diederich?

12      MR. MENNEMEIER:  Yes, sir.  D-i-e-d-e-r-i-c-h.

13      THE COURT:  All right.  Where does he live?

14      MR. MENNEMEIER:  I believe he's in the St. Louis

15  area.  St. Louis, Missouri, your Honor.

16      THE COURT:  Normally, he's got to be deposed back

17  there.  Do you want to bring him out here?

18      MR. PADUANO:  I don't know if he knows anything about

19  the facts.  I can tell you --

20      THE COURT:  Doesn't matter.  You're not going to get

21  any depositions unless they get two.

22      MR. PADUANO:  Your Honor, he's the regional

23  president.  In San Francisco, actually, Mr. Hatcher --

24      THE COURT:  Who do you represent knows the most about

25  this?

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

Page 43

071010_WHA_2
35

1      MR. PADUANO: Mr. Hatcher. Before this Court --

2      THE COURT: Why can't they take Diederich?

3      MR. PADUANO: I've never spoken to the man. I don't

4 know what, if anything, he knows about this at all. I can tell

5 the Court he didn't contribute at all to this case.

6      THE COURT: Why do you want to take his deposition?

7      MR. MENNEMEIER: Your Honor, because he's the person

8 who made the comment reflected on the attachment to the Lee

9 declaration.

10     THE COURT: I think that's good enough. I read that.

11 It hurts your case. I don't blame them for wanting to.

12     All right. So you have to confirm tomorrow all these

13 depositions that you want to take. They don't happen unless,

14 by tomorrow at 3:00 p.m., you confirm that Diederich is going

15 to be available in St. Louis at a place to be determined on

16 Wednesday of next week at 9:00 a.m.

17     And if you don't confirm that in writing by 3:00 p.m.

18 tomorrow, these other depositions that you want to take are

19 off.

20     MR. PADUANO: Understand, your Honor.

21     THE COURT: All right. You want to take Hatcher's

Page 44

071010_WHA_2

22 deposition?

23        MR. MENNEMEIER: Yes, sir, your Honor.

24        THE COURT: All right. Hatcher will be Friday of

25 next week, 9:00 a.m. And he's here in town, right?

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

36

1        MR. PADUANO: I believe he is, your Honor.

2        THE COURT: All right. Where do you want to take

3 him? It's going to have to be here in -- how about at their

4 law office?

5        MR. HUGHES: Sure.

6        MR. MENNEMEIER: In Mr. Hughes' office.

7        THE COURT: Hughes' office. 9:00 a.m. Sure. Okay.

8 Now, those are the four depositions.

9        I want -- for the Slayden deposition, Mr. Slayden has

10 got to bring with him to the deposition every single document

11 he took with him; every single computer file he took with him.

12 Any information of any type that he took with him, he's got to

13 bring.

14        Mr. Lee's got to bring to the deposition everything

15 that he got, all information that he got from Mr. Slayden at or

Page 45

071010_WHA_2

16 about the time or before the transition.

17    Okay. Now, that's the discovery plan. The Court's

18 going to order that FINRA start this in 15 days. I know

19 they're not a party to the case, but I'm going to be very

20 disappointed if anyone throws a monkey wrench in the

21 proceedings. So they got to get going in 15 days. If not, you

22 come back to see me. All relief will be vacated.

23    MR. MENNEMEIER: I'm sorry. Fifteen days from what,

24 your Honor?

25    THE COURT: From right now, because I'm going to

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

37

1 issue a T.R.O. of sorts. Here's what the T.R.O. is going to

2 say.

3    With respect to soliciting workers, there's no

4 relief, except for the one person who had a contract. And that

5 person's name was what?

6    MR. MENNEMEIER: Cathy McJilton, your Honor.

7    THE COURT: All right. She's barred from soliciting

8 employees directly or indirectly who used to work for or still

9 work for A.G. Edwards or do work for A.G. Edwards; now,

Page 46

071010_WHA_2

10  Wachovia.

11        On the other hand, the other people are not barred

12  from soliciting former employees.  This is without prejudice to

13  the plaintiff proving up later that somebody violated their

14  fiduciary duties while they still were with A.G. Edwards, and

15  getting billions of dollars in punitive damages; but right now,

16  they're no longer under any fiduciary duty, and the Court

17  doesn't buy the argument that there's this vague code of

18  conduct that -- and that people are chattel, and so forth.  So

19  the Court doesn't buy that, at least, on this record.

20        Now, with respect to the clients of the firm, the

21  Court can't do anything about any solicitation that went out

22  before today; but starting today, there will be no more

23  solicitation by any of these people who left A.G. Edwards.

24  Zero.

25        And -- but any solicitation that went out prior to

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

38

1  2:00 o'clock today, fine.  Starting 2:00 o'clock today, there

2  won't be any more solicitations until FINRA -- F-I-N-R-A -- or

3  this Court modifies the order to allow it.

Page 47

071010_WHA_2

4        And the reason for that is that I recognize that when

5   somebody goes from personal services to A -- goes from Firm A

6   to Firm B, normally, they can give notice. It sounds like

7   that's already happened here anyway, but I'm concerned with the

8   volume of information that was taken, and this idea that the

9   protocol applied in the case, when it turns out to be a

10  completely phony argument.

11       Fifteen days. We're not going to exacerbate the

12  situation. And no more solicitation.

13       Now, I want to be clear. If a client calls up these

14  guys that left -- these men and women that left -- and says,

15  "We want to go with you. We don't want to stay with

16  A.G. Edwards. We like you," no problem. They can do that.

17       And at that point, these four defendants can say,

18  "Great. We want to have you. Here's the paperwork." That's

19  all right; but what the four can't do is affirmatively contact

20  them and affirmatively solicit prior to a client of the

21  plaintiffs contacting them and asking for them to change firms.

22  So it's okay if the client makes the -- initiates the contact,

23  but it's not okay if the four defendants do so.

24       Now, it will be -- even though -- even though --

25  let's see. What's the name of this company? Slayden?

Lydia Zinn, CSR, RPR
Page 48

071010_WHA_2
Official Reporter - U.S. District Court
(415) 531-6587

39

1    MR. MENNEMEIER: Stifel, Nicolaus.

2    THE COURT: Stifel's lawyers here -- I'm ordering him

3  that if I find out that Stifel has been soliciting, this T.R.O.

4  runs against you.

5    MR. HUGHES: Understood, your Honor.

6    THE COURT: So don't try to get around it indirectly

7  by saying, "Well, they weren't a party."

8      So this is just for 15 days until you get before

9  FINRA, and FINRA can fix it up any way that's right; but in my

10  judgment, whatever rights the plaintiff is going to be able to

11  establish will completely have been evaporated in 15 days, so

12  the further solicitation will stop of clients for 15 days.

13  Well, until such time as FINRA or this Court modifies its --

14  I'm basing this -- I'm saying 15 days only because that's what

15  counsel have told me.

16      Now, all information that these four defendants have

17  taken with them of any type must be preserved.  It's evidence

18  now.  And if the Court finds out there's been any destruction,

19  including e-mails and so forth, it will be destruction of

20  evidence, and I will have to consider referring it to the

Page 49

071010_WHA_2

21   U.S. Attorney for obstruction of justice, so don't go there.

22   Preserve the evidence.

23      Whatever accounts that they have already managed to

24   get -- the 240 -- more power to them. They're going to have

25   to -- at least, I'm not going to stop them. For the time

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

40

1   being, they get to continue on using, servicing those clients,

2   and any more that are in the pipeline for which the paperwork

3   is already started. They're going to be able to get those, but

4   there won't be any new active solicitations from this day

5   forth.

6      Now, the plaintiff is ordered that if a client calls

7   in and says, "I want to talk to Mr. Slayden. Where is he?"

8   You say, "He's gone to work for another firm, but here's his

9   phone number," so that if somebody's trying to reach him, you

10   don't sabotage his efforts to maintain -- and then if that

11   client calls Mr. Slayden, it's perfectly okay for Slayden to

12   call back and to talk to that person and, in my judgment,

13   solicit that person to come over, but that's because the phone

14   call was initially made by -- and so your company on the

Page 50

071010_WHA_2

15 plaintiff's side ought to keep good records of who's called in.

16       MR. PADUANO:  We will, your Honor.

17       THE COURT:  I think that's all I have.

18       What else do you have for me?

19       MR. PADUANO:  Your Honor, one thing as to what the

20 Court -- Mr. Lee -- in terms of the documents Mr. Lee must

21 bring as a corporate representative for A.G. Edwards, we would

22 ask -- I just heard his name as the person who hired

23 Mr. Slayden.  We'd ask that the records that Mr. Slayden gave

24 to A.G. Edwards in some form.  I don't want to limit it -- that

25 Mr. Lee says somebody else got them.  I don't know what

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415) 531-6587

41

1 Mr. Lee --

2       THE COURT:  Well, look.  Any records that Mr. Lee

3 knows went from A.G. Edwards to Stifel -- whether it came

4 directly to Lee or to someone else, if he knows about it, he's

5 got to take them to a deposition the deposition; but I am not

6 going to require that he be under some hell-or-high-water

7 commitment to go out and dig up everything.  This is all on a

8 hurry-up basis.

Page 51

071010_WHA_2

9       MR. PADUANO: I understand. Thank you.

10      THE COURT: So he doesn't have to do a big-firm,

11 scorched-earth search to find all those materials.

12      MR. MENNEMEIER: Your Honor, I had a couple

13 questions, too.

14      THE COURT: Of course. Go ahead.

15      MR. MENNEMEIER: First of all, in the deposition of

16 Mr. Hatcher, we didn't talk about any documents he would bring.

17      THE COURT: What documents could he bring? What do

18 you want?

19      MR. MENNEMEIER: Well, I would -- any documents, if

20 he has any, that would support the allegations he made in his

21 declaration.

22      THE COURT: Fine. Any documents that Mr. Hatcher has

23 that he believes support the allegations made in his

24 declaration should be brought to the deposition.

25      MR. MENNEMEIER: And then my second question,

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

42

1 your Honor, was: I just wanted to make sure I was clear on the

2 effect of the Court's order after 15 days.

Page 52

071010_WHA_2

3      THE COURT:  Well, it stays in effect ad infinitum,

4  until FINRA modifies it or until I modify it, but I will tell

5  you that I'm not going to put a terminal date on it, because I

6  expect that it will go forward in 15 days, but for your

7  benefit, if the -- if it doesn't start in 15 days, and there's

8  a snafu, you come in and see me, and I may vacate this, because

9  I will tell you I don't trust NASDAQ or -- not NASDAQ.  What is

10  it? -- NASD.

11      All those arbitration outfits -- they are delay city.

12  And if there's delay city involved here because the plaintiff

13  has gotten some relief and wants to drag it out, I'm going to

14  vacate the order.  So it's -- the burden is on the plaintiff to

15  get in there and get this arbitration going, and to stop the

16  delay city.

17      I have taken cases back.  I won't dismiss a NASD

18  thing.  I will give them six months to get it done.  If this

19  doesn't do it, I'll bring in a jury and we'll try the case,

20  because the NASD is a -- NASD -- I don't want to say it's a

21  gimmick, but -- because it's better than a gimmick.  It's just

22  a procedural mechanism to delay justice in some cases.

23      So I feel the same way here.  This thing doesn't get

24  off the ground, and you feel like you're being delayed or you

Page 53

071010_WHA_2

25 get into it and they start dragging their feet because they've

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

☐

43

1 got three of them, they can't agree on it, you come see me.

2 We'll get a jury to decide this case. Then you can all fight

3 it out in the Ninth Circuit; but I'm telling you that this

4 arbitration has been greatly overblown and overstated as to its

5 true value. The original court resolution system works a lot

6 better than arbitration because it's faster, so forth. I'll

7 promise you you'll have a resolution of this probably by

8 December 31 if you stay here.

9       I urge you both to think about doing that, but I'm

10 going to assume that until I hear otherwise, but if it does go

11 into this FINRA thing, then we'll give that a fair, good-faith

12 shot. See how it goes. Maybe it will be over and expedited,

13 just like Counsel says.

14       Okay. I need to run. All right. You two meet and

15 confer. Give me a form of order by Friday. Would you, please?

16       MR. PADUANO: We'll do that, your Honor.

17       THE COURT: That captures what we've done here. All

18 right? But the order is in effect right now.

Page 54

071010_WHA_2

19    MR. MENNEMEIER: That's clear, your Honor.  Thank

20  you.

21    THE COURT: It's verbal, but you can put it in

22  writing.  I would appreciate it.  Thank you.

23    (Proceedings adjourned at 2:08 p.m.)

24           - - - -

25

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing proceedings in C-07-05154-WHA, A.G. EDWARDS & SONS,

INC., V. SAMUEL SLAYDEN, DENISE GILSETH, CATHY MCJILTON, AND

KELLY STROMGREN, were reported by me, a certified shorthand

reporter, and were thereafter transcribed under my direction

into typewriting; that the foregoing is a full, complete and

true record of said proceedings as bound by me at the time of

filing.

The validity of the reporter's certification of said

Page 55

071010_WHA_2

transcript may be void upon disassembly and/or removal

from the court file.

---

Lydia Zinn, CSR 9223, RPR

Wednesday, October 10, 2007

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

Page 56

**EXHIBIT B**

PADUANO & WEINTRAUB LLP
1251 AVENUE OF THE AMERICAS
NINTH FLOOR
NEW YORK, NEW YORK 10020

TELEPHONE: 212-785-9100
TELECOPIER: 212-785-9099

October 23, 2007

Via Fax and U.S. Mail

George R. Friedman, Esq.
Executive Vice President,
Director of Dispute Resolution
FINRA Dispute Resolution, Inc.
Northeast Regional Office
One Liberty Plaza
165 Broadway, 27th Floor
New York, New York 10006-1400

Re: A.G. Edwards & Sons, Inc. v. Samuel Slayden, et al.,
FINRA Dispute Resolution Arbitration Number 07-02897

Dear Mr. Friedman:

We represent Claimant A.G. Edwards & Sons, Inc. in the above-referenced matter. We write to strike E. Duane Stephens and Ralph A. Cotton from the Panel for cause under Rule 13410 of the NASD Code of Arbitration Procedures for Industry Disputes because of their apparent bias and lack of impartiality toward this firm and our California co-counsel, Keesal, Young & Logan, respectively.

Mr. Stephens is employed as a financial consultant by Citigroup Global Markets, Inc., a division of Citigroup Inc., one of the principal clients of this firm since 1991. In many cases, as in this one, we have represented employers suing their former employees for breaches of their duties and contractual obligations and have thereby taken a position directly contrary to Mr. Stephens' interests as an employee of Citigroup. Those cases include Citicorp Financial Services Corporation v. UBS International Inc., Ignacio Altuve, Luciano Porzio and Rodrigo Vila, NASD No. 05-04218; Citicorp Financial Services Corporation Luciano Porzio, NASD No. 06-04974; and Citicorp Financial Services Corporation v. UBS International Inc., Ignacio Altuve, Luciano Porzio and Rodrigo Vila, Civ. No. 05-1867 (HL) (D. P.R.). We expect those cases, and others like them involving Citigroup, to be discussed and argued extensively at the hearing. Thus, this firm is potentially adverse to Mr. Stephens, who would have an interest in seeing Claimant's arguments fail. At the same time, of course, we have an effective attorney-client relationship with Mr. Stephens by virtue of his employment. As such, we believe

PADUANO & WEINTRAUB LLP

George R. Friedman, Esq.
October 23, 2007
Page 2

that Mr. Stephens cannot be impartial in this case and should be removed from the Panel.

With respect to Mr. Cotton, his disclosure report states that he has done work for Keesal, Young & Logan, our co-counsel. Our colleagues at Keesal Young & Logan confirm that they have hired Mr. Cotton as an expert witness and paid him for his services. Given that background, Mr. Cotton has a conflict of interest and apparent bias and cannot be impartial in this matter.

Therefore, both arbitrators should be struck for cause under Rule 13410 and replaced as soon as possible by arbitrators who are available for the hearing on Monday October 29, 2007. Given the closeness of that hearing date, we ask for expedited treatment of this request.

Yours sincerely,

Anthony Paduano

cc:     Kenneth C. Mennemeier, Esq.
        James A. Hughes, Esq.
        Joseph A. Dougherty, Esq.
        Gordon C. Young, Esq.
        Ms. Maria Reyes, FINRA Los Angeles Office
        (All by Fax and Email)

**EXHIBIT C**

PADUANO & WEINTRAUB LLP
1251 AVENUE OF THE AMERICAS
9TH FLOOR
NEW YORK, NEW YORK 10020

TELEPHONE: 212-785-9100
TELECOPIER: 212-785-9099

October 27, 2007

**BY FAX and EMAIL**

Kenneth C. Mennemeier, Esq.
Mennemeier, Glassman & Stroud LLP
980 9th Street, Suite 1700
Sacramento, California 95814-2736

James A. Hughes, Esq.
Sullwold & Hughes
235 Montgomery Street, Suite 730
San Francisco, California 94104

Joseph A. Dougherty, Esq.
Buchanan Ingersoll & Rooney PC
1835 Market Street, 14th Floor
Philadelphia, Pennsylvania 19103-2985

Re: A.G. Edwards & Sons, Inc. v. Slayden, et al.,
FINRA Dispute Resolution Arbitration No. 07-02897

Dear Counsel:

We represent Claimant A.G. Edwards & Sons, Inc. ("Edwards" or "Claimant") in the above-referenced matter. Please be advised that Claimant may call the following persons as witnesses in the portion of the hearing of this matter concerning injunctive relief:

Jaime Van Heusen
Cathy McJilton
Kelly Stromgren
Christian Amador
Denise Gilseth
Samuel Slayden
Greg VanKestren
John Lee
James Lee
Susan Salton
Beth Brown
Betty Hollander
Ronald Kruszewski

PADUANO & WEINTRAUB LLP

Crystal Schlegl
Kristen Fishero
Miranda Loepker
Andy Knott
Tom Bjork
Dave Luna
Greg Little
Mark Tobin
Jim Zemlyak
David Sliney
Doug Gaines
Pat Hassna
Michael Chris Nielsen
William Hatcher
Patricia Porter
Representative of Landlord of Building in which Edwards and Stifel Nicolaus &
Company, Inc. ("Stifel") have Santa Rosa branch offices;
Custodian of Records for Stifel;
Representative(s) of telephone companies who provide service to any of the individual
Respondents;
Representative of any company with which Respondents do business as identified in
the documents produced and/or in Respondents' discovery responses;
Any current or former client of Edwards who was contacted or solicited by or on behalf
of Respondents, or who transferred an account with the involvement of Respondents;
Any current or former client of Edwards who contacted Respondents after their
resignation from Edwards as identified in the documents produced and/or in
Respondents' discovery responses;
Any person identified by any party on its witness list or called by any party as a witness.
Any person identified by any party or non-party in any documents to be produced;
Any person identified in testimony;
Any witnesses necessary to authenticate documents produced by any party, non-party
or pursuant to subpoena.

        The foregoing identification of witnesses may be amended at any time
prior to trial based on the ongoing discovery, or if witnesses are identified. This
designation of witnesses is for purposes of the injunctive relief portion of the hearing
only. Also, this designation of witnesses is without prejudice to the rights of Claimant to
call additional witnesses as rebuttal or in cross-examination during the hearing. We
reserve the right to supplement our witness list.

Sincerely,

Katherine B. Harrison

Cc: Maria Reyes, FINRA

2

# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA


A.G. EDWARDS & SONS, INC.,

                    Plaintiff,

v.                                    No. C 07-05154-WHA

SAMUEL SLAYDEN, DENISE GILSETH,
CATHY MCJILTON, and KELLY
STROMGREN,

                    Defendants.
_____/



DEPOSITION OF WILLIAM HATCHER

Friday, October 19, 2007

San Francisco, CA



Reported By:

DEBBIE MAYER, RPR CRR CRP
California CSR No. 9654



ATKINSON-BAKER, INC.
180 Montgomery Street, Suite 800
San Francisco, CA   94104
(800) 288-3376
A108E18

///


ATKINSON-BAKER, INC.   (800) 288-3376

A108E18
WILLIAM HATCHER – October 19, 2007

Page 2

1                    WILLIAM HATCHER, 10/19/2007

2

3           BE IT REMEMBERED THAT, pursuant to the laws

governing the taking and use of depositions, and on
4
Friday, October 19, 2007, 8:00 a.m., at 235 Montgomery
5
Street, Suite 730, San Francisco, CA 94104, before me,
6
Debbie Mayer, a Certified Shorthand Reporter for the
7
State of California, there personally appeared:
8

9                    WILLIAM HATCHER,

10

11
called as a witness by the Defendants, who, being by me
12
first duly sworn/affirmed, was thereupon examined and
13
testified as is hereinafter set forth.
14

15

16

17

18

19

20

21   ///

22

23

24           ATKINSON-BAKER, INC.   (800) 288-3376

25

A108E18
WILLIAM HATCHER - October 19, 2007

Page 3

1                    WILLIAM HATCHER, 10/19/2007

2

                          A P P E A R A N C E S
3

4

    For the Plaintiff A.G. EDWARDS:
5

                PADUANO & WEINTRAUB, LLP
6               BY:    LEONARD WEINTRAUB, ESQ.
                1251 Avenue of the Americas, 9th Floor
7               New York, NY  10020
                (212) 785-9100 (tel)
8               (212) 785-9099 (fax)
                lw@pwlawyers.com
9

10   For Defendants SAMUEL SLAYDEN, DENISE GILSETH,
     CATHY MCJILTON, and KELLY STROMGREN:
11

                MENNEMEIER, GLASSMAN & STROUD, LLP
12              BY:    KENNETH C. MENNEMEIER, ESQ.
                U.S. Bank Plaza
13              980 Ninth Street, Suite 1700
                Sacramento, CA  95814
14              (916) 551-2580 (tel)
                (916) 553-4011 (fax)
15              kcm@mgslaw.com

16
     For Defendant STIFEL NICOLAUS:
17
                SULLWOLD & HUGHES
18              BY:    JAMES A. HUGHES, ESQ.
                235 Montgomery Street, Suite 730
19              San Francisco, CA  94104
                (415) 263-1850 (tel)
20              (415) 989-9798 (fax)

21

22

23

24   ///

25              ATKINSON-BAKER, INC.  (800) 288-3376

A108E18
WILLIAM HATCHER - October 19, 2007

Page 62

1   Q. My understanding is that the contracts for

2 registered financial associates do contain provisions

3 that would prohibit the registered financial associate

4 from soliciting clients of A.G. Edwards if that

5 registered financial associate were to leave

6 A.G. Edwards; is that consistent with your

7 understanding?

8   A. Yes.

9   Q. My understanding is that the reason for the

10 inclusion of that clause in a contract for registered

11 financial associate is because Edwards does not want

12 such persons to serve in that role assisting brokers and

13 getting introduced to a brokers' book of business and

14 then leaving A.G. Edwards for a competitor to solicit

15 the broker's book of business while the broker remains

16 at A.G. Edwards; is that consistent with your

17 understanding?

18   A. Yes.

19   Q. Is it fair to say then that Edwards --

20 A.G. Edwards contracts for registered financial

21 associates generally have provisions that prohibit the

22 registered financial associate from soliciting Edwards'

23 clients if the registered financial associate leaves,

24 but that the contracts for financial consultants do not

25 prohibit the financial consultants from soliciting

Page 63

1    Edwards' clients that they served at Edwards if they

2    leave?

3         A.    That's a whole lot of question.  Can you --

4         Q.    Let me start over and see if I can break it

5    down.

6         A.    Thank you.  Thank you.

7         Q.    Is it fair to say that A.G. Edwards' contracts

8    for registered financial associates generally prohibit

9    those individuals from soliciting clients they worked

10   with at Edwards if those individuals leave Edwards?

11        A.    I'm sorry, I'm confused.  I wasn't clear on

12   the first question.

13        Q.    Let me try it again.  Is it your understanding

14   that the Edwards' contracts for registered financial

15   associates generally prohibit those persons from

16   soliciting clients they served at Edwards after they

17   leave Edwards?

18        A.    Yes.

19        Q.    And is it your understanding that the

20   contract -- is it your understanding that Edwards'

21   contracts for financial consultants do not prohibit

22   those financial consultants from soliciting clients they

23   served at Edwards after they leave Edwards?

24        A.    Yes.

25        Q.    With regard to your declaration, let me ask

Page 74

1       Q.   So, if I understand Exhibit I correctly, this
2   is a document that originates with A.G. Edwards?
3       A.   Yes.  This is a document that originates with
4   A.G. Edwards.
5       Q.   And the document you're referring to is
6   Exhibit I to your declaration, which is Exhibit A to
7   your deposition today.
8            So, this A.G. Edwards document that's
9   Exhibit I to your declaration, from this document, can
10  you tell when it was generated?
11      A.   Well, the date of the document is 9-28 of '07.
12      Q.   And your understanding is that is a date
13  before Kelly Stromgren left A.G. Edwards, correct?
14      A.   That's my understanding.
15      Q.   So, one interpretation of this document would
16  be that this is a client of Kelly Stromgren's who is
17  transferring the client's account to Stifel Nicolaus on
18  a date prior to Kelly Stromgren's departure, correct?
19      A.   Yes.
20      Q.   Are there any other alternative explanations
21  for why, or how it could be that a client assigned to
22  Kelly Stromgren could be transferring an account to
23  Stifel Nicolaus before Kelly Stromgren departures
24  A.G. Edwards?
25      A.   So your question is, could there be any other

A108E18
WILLIAM HATCHER - October 19, 2007

Page 75

1    explanations?

2        Q.    Yes?

3        A.    Yes.

4        Q.    What would an alternative explanation be?

5        A.    By chance that they were transferring their

6    account to a Stifel Nicolaus office somewhere in the

7    country prior to that.

8        Q.    Can you think of any other alternative

9    explanations?

10       A.    No.

11       Q.    You told me earlier that when brokers leave a

12   branch, the branch manager is to immediately reassign

13   their accounts; is that correct?

14       A.    Yes.

15       Q.    And you understood that Mr. Slayden and

16   Ms. Gilseth left me Santa Rosa office on September 20th?

17       A.    Yes.

18       Q.    And you understood that the new branch manager

19   had reassigned their accounts?

20       A.    Yes.

21       Q.    And after Mr. Slayden and Ms. Gilseth

22   departed, Kelly Stromgren was one of the financial

23   consultants who remained in that office?

24       A.    Yes.

25       Q.    And did you have an understanding then as to

Page 76

1   whether Kelly Stromgren was one of the financial

2   consultants to whom the new branch manager may have

3   assigned some of Mr. Slayden's and Ms. Gilseth's

4   accounts?

5        A.   No.

6        Q.   Before you submitted your declaration, what

7   inquiry if any did you make to determine whether the

8   account represented by Exhibit I to your declaration was

9   a Slayden client or a Gilseth client who had been

10  reassigned to Kelly Stromgren?

11       A.   So you're asking me what did I do?

12       Q.   Yes.

13       A.   I did not do anything.

14       Q.   Do you know whether anybody inquired to

15  determine whether the client represented by Exhibit I to

16  your declaration was a Slayden client or a Gilseth

17  client who had been reassigned to Kelly Stromgren?

18       A.   I don't know.

19       Q.   As you sit here today, do you know whether the

20  client who's represented by Exhibit I to your

21  declaration is a client served by Mr. Slayden or

22  Ms. Gilseth, whose account was reassigned to

23  Kelly Stromgren?

24       A.   I do not know.

25       Q.   You would agree with me that one explanation

A108E18
WILLIAM HATCHER - October 19, 2007

Page 77

1    of Exhibit I is that it could be in connection with a

2    client of Mr. Slayden or Ms. Gilseth who was reassigned

3    to Kelly Stromgren prior to the transfer form coming in,

4    correct?

5         A.    Possibly.

6         Q.    And you'd agree with me that -- so, you'd

7    agree with me that under those circumstances, Exhibit I

8    would not represent a situation in which Kelly Stromgren

9    solicited a client before her departure, correct?  I'm

10   sorry, that was a bad question.  I'll start over.

11        A.    Thank you.

12        Q.    You'd agree with me that if the client whose

13   account is represented by Exhibit I was a Slayden client

14   or a Gilseth client, then Exhibit I would not represent

15   a situation reflecting Kelly Stromgren having solicited

16   one of her clients to move to Stifel Nicolaus before her

17   departure?

18        A.    If that was the case, yes.

19        Q.    And so, you and I would agree that there are

20   alternative explanations for Exhibit I, one of which

21   would be Kelly Stromgren soliciting a client before she

22   left, but alternative explanations which would be

23   innocent explanations?

24             MR. WEINTRAUB:    Object to the form.

25        A.    I would agree with that statement.

A108E18
WILLIAM HATCHER - October 19, 2007

Page 84

1    A.G. Edwards maintains in order to satisfy the know your

2    customer rule and the suitability rule?

3        A.    Yes.

4        Q.    And in those records, would there be an

5    indication of when this client opened her A.G. Edwards

6    account?

7        A.    Yes.

8        Q.    Would there be an indication of the Edwards

9    financial consultant who opened the account?

10       A.    The original broker?

11       Q.    Yes.

12       A.    Yes.

13       Q.    Do you know whether anybody has looked at

14   those records to determine who the financial consultant

15   was that opened this client's A.G. Edwards account?

16       A.    I have no idea.

17       Q.    Within A.G. Edwards' books and records, would

18   there be documents showing when this client's account

19   was first assigned to Kelly Stromgren?

20       A.    Yes.

21       Q.    To your knowledge, has anybody checked those

22   records to determine when this client's account was

23   first assigned to Kelly Stromgren?

24       A.    I do not know.

25       Q.    Before your declaration was submitted to the

A108E18
WILLIAM HATCHER - October 19, 2007

Page 85

1   Court suggesting that this represented the transfer of a

2   client account for a client of Ms. Stromgren where

3   Ms. Stromgren -- well, with the inference that

4   Ms. Stromgren solicited the client before she left, do

5   you know was any inquiry made to determine when this

6   client was first assigned to Ms. Stromgren?

7       A.   I do not know.

8       Q.   Do I understand correctly that before you

9   submitted your declaration to the Court, you did not

10  make any inquiry to determine when this client's account

11  was first assigned to Kelly Stromgren?

12      A.   That is correct.

13      Q.   During the period that you were a producing

14  broker with A.G. Edwards, how did you develop your own

15  book of business?

16      A.   Varied ways. Cold calling, referrals, the two

17  primary ways. Seminars.

18      Q.   By seminars, you mean presentations that you

19  would do and invite people to come to, to share with

20  them information and whatever presentation you had in

21  order to give them some exposure to you?

22      A.   Yes.

23      Q.   And then referrals, you're talking about

24  people in the community who might know somebody in need

25  of a financial adviser or financial consultant, and then

Page 100

1       A.   No.  No.

2       Q.   And the distinction that you would draw would

3   be those instances in which the brokers have a contract

4   that specifically prohibits them from soliciting clients

5   under the terms of the contract?

6       A.   Yes.

7       Q.   In the absence of a contract that would

8   prohibit a broker from soliciting clients, is it your

9   understanding that departed Edwards' brokers are free to

10  solicit clients that they served while at Edwards?

11      A.   Yes.

12      Q.   Have you ever discussed with Gene Diederich

13  what he means when he says that the FC and not the firm

14  owns the client relationship?

15      A.   No.

16      Q.   Are you familiar at all with the industry

17  protocol for departing brokers?

18      A.   Yes.

19      Q.   What's your understanding of that?

20      A.   We joined the protocol sometime in the last

21  six months.

22      Q.   Were you involved in that decision to join?

23      A.   No.

24      Q.   What's your understanding of what that

25  protocol provides for?

Case Name:    *A.G. Edwards & Sons, Inc. v. Slayden, et al.*
Case No.:     U.S. District Court, Northern District of California, Case No. 07-CV-05154 WHA

# PROOF OF SERVICE

I declare as follows:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 980 9th Street, Suite 1700, Sacramento, California 95814. On November 7, 2007, I served the within documents:

## DECLARATION OF KENNETH C. MENNEMEIER IN SUPPORT OF DEFENDANTS' MOTION TO MODIFY TEMPORARY RESTRAINING ORDER

☒     by placing the document(s) listed above in a sealed Federal Express envelope and affixing a pre-paid air bill, and delivering to a Federal Express agent for delivery.

**ANTHONY PADUANO**
**PADUANO & WEINTRAUB LLP**
**1251 AVENUE OF THE AMERICAS**
**NINTH FLOOR**
**NEW YORK, NEW YORK 10020**
**FACSIMILE: 212.785.9099**

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepared in the ordinary course of business.

☒     I declare that I am employed in the office of a member of the bar of this Court at whose direction this service was made.

Executed on November 7, 2007, at Sacramento, California.

Angela Knight