FINRA DISPUTE RESOLUTION, INC.

In the Matter of the
Arbitration Between

A.G. EDWARDS & SONS, INC.,

    Claimant,

    -and-                    No. 07-02897

SAMUAL SLAYDEN, DENISE GILSETH,
CATHY MCJILTON, KELLY STROMGREN,
and STIFEL, NICOLAUS & CO., INC.,

    Respondents.
_____/

RULE 13804 PRELIMINARY HEARING

TAKEN ON:  October 30, 2007

MICHELE J. LUCAS,
CERTIFIED SHORTHAND REPORTER, No. 4017

1   Tuesday, October 30, 2007
2   PROCEEDINGS
3   THE CHAIRMAN: We are going back on the
4   record. The reporter has not transcribed the
5   portion of this morning's hearing. She is here
6   now, and her record is open as well.
7   The panel has confirmed we have no epiphany
8   to report. The one thing I think we can do is
9   rule as if the hearing is over, when, in fact, the
10  hearing is not over. And so we are going to have
11  to leave the order in place, and until such time
12  as the hearing is over. And we are going to talk
13  now about when we can get two more days as quickly
14  as possible.
15  I have conferred again with the panel about
16  whether there is any possibility of continuing
17  this week. We cannot convene a full panel the
18  remainder of this week, and FINRA is not planning
19  for that, in any event. I return on
20  November 14th. I am available any time for the
21  15th or later, for two dates.
22  Let's solicit other viewpoints.
23  MR. PADUANO: Mr. Chairman, I need to leave
24  the room for about 20 seconds to retrieve my
25  calendar.

In the Matter of the Arbitration Between A.G. Edwards & Sons and Samuel Slayden                                    Finra Arbitration

Page 483

1   A.G. Edwards.  No one told you to leave
2   A.G. Edwards.
3       You were free to stay?
4   A.  It wasn't A.G. Edwards anymore.
5   Q.  You were free to stay at your current job?
6   A.  I was free to stay, but at Wachovia.
7   Q.  Number 17, that you were asked about, please.
8       Put that back in front of the witness.
9       You were asked a question as to paragraph
10  one, whether you considered yourself to be a loyal
11  and faithful employee of Edwards and take no
12  action that would harm A.G. Edwards business or
13  its relationships with its customers/clients, and
14  you said, "Yes, I was good."
15  A.  Yes, I was good.
16  Q.  Do you think it was good when you printed off
17  confidential information off the server and gave
18  it to Mr. Slayden, so he could endeavor to take
19  those clients away from A.G. Edwards?
20  A.  I did what he asked me to do.  I did not take
21  into consideration whether I was printing them for
22  him to take them away or not.
23  Q.  You knew what he was using them for?
24  A.  In my mind I did.
25  Q.  Do you think that was being good, loyal, and

1  faithful to A.G. Edwards, to take
2  more than $100 million in client assets?
3  A.  I didn't see it facilitating anything I did,
4  what he asked me to do.
5  Q.  In response to No. 29 and 30, that you were
6  not -- I am sorry, No. 29 -- you were not going to
7  be involved directly or indirectly, you had no
8  intention of being involved in soliciting or
9  enticing or inducing anyone to terminate their
10 employment with Edwards, right?
11 A.  That's right.
12 Q.  So the Court's order has no effect on you in
13 that regard, right?
14 A.  No, it doesn't.
15 Q.  It is okay with you that the order is like it
16 is because that is the agreement you signed,
17 right?
18         MR. MENNEMEIER: Objection.
19         THE CHAIRMAN: What is the objection?
20         MR. MENNEMEIER: Attorney-client
21 communication.
22         MR. PADUANO: Q. I don't want to know anything
23 your lawyer said to you.
24         Withdraw the question.
25         You signed a contract, and from what I

1  understood from your testimony when you were asked
2  questions, you were going to adhere to what it was
3  you signed, right?
4  A.   I was informed that I could not do it,
5  because I -- as part of my contract. And I didn't
6  do it. I didn't do it anyway.
7  Q.   You had no trouble honoring the terms of your
8  contract?
9  A.   Why would I? No.
10 Q.   It says you are not going to solicit any
11 clients, directly or indirectly, in any way.
12      You have no problem with the Court's order in
13 that regard, because it is simply enforcing the
14 contract, right?
15      MR. HUGHES: I object on the grounds that it
16 calls for a legal conclusion, and that is as to
17 whether it is appropriate for a Court to enter an
18 order to enjoin something that isn't threatened.
19      THE CHAIRMAN: I am not sure that was the
20 question.
21      MR. HUGHES: He is asking whether she has any
22 problem with it. That is really something for her
23 lawyers.
24      THE CHAIRMAN: I think she has actually
25 answered that already.

In the Matter of the Arbitration Between A.G. Edwards & Sons and Samuel Slayden                    Finra Arbitration

Page 486

1          Is there something additional?
2          MR. PADUANO: Give me one second, please.
3     Q.   So if I understood your direct on 29 and 30,
4     they don't have any effect on you, because of your
5     role, right?
6     A.   Not me, personally. But I find it a little
7     disconcerting that my cohorts cannot contact their
8     clients.
9     Q.   I didn't ask you anything about that,
10    Ms. McJilton.
11         As to 29 and 30, you had no problem with it,
12    because that is the terms of your agreement.
13         You are going to stick by what you signed to
14    do?
15    A.   I am going to cover the terms of my contract,
16    yes.
17    Q.   Number 29, the same thing regarding books and
18    records and documents and confidential
19    information, you intended to honor that provision
20    as well, just like that which is contained in 29
21    and 30?
22    A.   29 has nothing to do with documents.
23    Q.   25?
24    A.   You said "29."
25    Q.   Just like 29 and 30, you have no problem with

1    those provisions?
2         25, you have no problem?
3    A.   I didn't take anything.
4    Q.   So the Court's order -- let me ask you, you
5    are getting paid, right?
6    A.   I am getting a salary.
7    Q.   So there is no adverse effect, economically,
8    on you by the Court's order, correct?
9    A.   Yes, there is.
10   Q.   What is the effect on you, personally, ma'am?
11   A.   I get a percentage of his commission, and if
12   he can't have his clients to do business, I don't
13   get a percent of it.
14   Q.   I am asking you in terms of your behavior.
15   A.   That is not what you asked.  But the effect
16   on me and my behavior, I don't contact clients.  I
17   never have contacted clients for solicitation.  I
18   have no problem in following the terms of my --
19   yeah.
20        MR. PADUANO: Okay.  Okay.  Thank you.
21   Thank you, Mr. Chairman.
22        MR. LAU: Follow-up question?
23        THE CHAIRMAN: Yes, go ahead.
24             RECROSS-EXAMINATION BY MR. LAU
25        MR. LAU: Q.  I am placing before you

```
 1   Q.   But as to everything else about the computer,
 2   was he able to tell you what the program was
 3   about --
 4   A.   Yes.
 5   Q.   -- what the products were about --
 6   A.   Absolutely.
 7   Q.   -- things like that --
 8   A.   -- to your satisfaction?
 9   A.   Yes.
10   Q.   Was Mr. Slayden surprised by your phone call,
11   your visit, in any way?
12   A.   No.
13   Q.   Did you work closely with Ms. Gilseth?
14   A.   Yes.
15   Q.   How so?
16   A.   Her backup broker, when she goes on vacation,
17   she is mine when I go on vacation.
18   Q.   The first time you found out she was going to
19   Stifel, I heard you say, was September 20th?
20   A.   Correct.
21   Q.   Had she expressed to you unhappiness or
22   displeasure with A.G. Edwards prior to
23   December 20th?
24   A.   Not A.G. Edwards, but Wachovia, yes.
25   Q.   What did she say to you?
```

1    A.    It was sent to Ken.

2    Q.    When was that?

3    A.    I don't remember the date.

4    Q.    It was after a demand was made to you, right?

5    A.    I believe so.

6          MR. PADUANO: It is not a great time to stop,

7    but we have to stop; otherwise, we go on too long.

8          THE CHAIRMAN: We are going to adjourn the

9    first two days of this hearing.

10         As I have spoken about before, we have

11   requested from FINRA to reserve a hotel room,

12   hopefully this one or another room in this hotel,

13   for the 15th and 16th of November; and we have a

14   common understanding that the end of the 16th will

15   be the end, in toto, of the hearing.

16         In terms of production of documents, I remind

17   everybody there is an ongoing continuing

18   obligation and do the best you can to produce what

19   is requested.

20         I would ask counsel to meet and confer

21   tomorrow and to arrange with me -- arrange with

22   FINRA who would contact me if you would like to

23   have a telephone conversation earlier in the week.

24   I will telephone Maria Rayes tomorrow morning

25   explaining the situation and give her my contact