071010_WHA_2

Volume 1

Pages 1 - 43

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

A.G. EDWARDS & SONS, INC.,          )
                                    )
          Plaintiff,                )
                                    )
   VS.                              )  NO. C-07-05154-WHA
                                    )
SAMUEL SLAYDEN, DENISE GILSETH,     )
CATHY MCJILTON, and KELLY           )
STROMGREN,                          )
                                    )  San Francisco, California
          Defendants.               )  Wednesday
                                    )  October 10, 2007
_____)  1:10 p.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:        PADUANO & WEINTRAUB LLP
                      1251 Avenue of the Americas
                      Ninth Floor
                      New York, New York  10020
                      (212) 785-9100
                      (212) 785-9099 (fax)
                  BY: ANTHONY PADUANO

For Defendants:       Mennemeier, Glassman & Stroud LLP
                      980 9th Street, Suite 1700
                      Sacramento, CA  95814
                      (916) 553-4000
                      (916) 553-4011 (fax)
                  BY: KENNETH C. MENNEMEIER
                      STEPHEN LAU

Reported By:   Lydia Zinn, CSR #9223, RPR
               Official Reporter - U.S. District Court

                                                    2

1          THE CLERK:  Calling Civil Action Number C-07-5154,

2  A.G. Edwards versus Slayden, for a motion hearing.

3          Could you please state your appearances for the

071010_WHA_2

 4  record?

 5          MR. PADUANO:  Good afternoon.  Anthony Paduano, for

 6  plaintiff.

 7          THE COURT:  Say that again.

 8          MR. PADUANO:  Anthony Paduano, for plaintiff.

 9          THE COURT:  How do you spell that?

10          MR. PADUANO:  P-a-d-u-a-n-o.

11          THE COURT:  Paduano.

12          MR. PADUANO:  I'm sorry?

13          MR. PADUANO:  Paduano, P-a-d-u-a-n-o.

14          THE COURT:  -- n-o?

15          MR. PADUANO:  Yes, sir.

16          THE COURT:  Okay.  And who else over there?

17          MR. PORIANDA:  Zachary Porianda, just a litigation

18  assistant.

19          THE COURT:  You used to work here.

20          MR. PORIANDA:  I did.  I was with Judge Jenkins.

21          THE COURT:  Yeah.  I remember you.

22          MR. MENNEMEIER:  Ken Mennemeier, on behalf of the

23  defendants.  And I'll help on that one.  It's

24  M-e-n-n-e-m-e-i-e-r.

25          THE COURT:  Okay.

                            Lydia Zinn, CSR,  RPR
                  Official Reporter -  U.S. District Court
                            (415)  531-6587

                                                    3

 1          MR. LAU:  Good morning, your Honor.  Stephen Lau, for

 2  defendants.

 3          THE COURT:  Okay.  Welcome to everybody.

 4          Who is that in the back?

 5          MR. HUGHES:  Your Honor, my name is James Hughes.

 6  I'm an attorney representing Stifel, Nicolaus & Company,

                              Page 2

071010_WHA_2

7   Incorporated, which employs the defendants, but is not named as

8   a defendant in this action.

9           THE COURT:  All right.  You're welcome to stay.  Have

10  a seat.

11          We're here on a motion for a T.R.O.  I've read, I

12  think, most everything.  I can't promise you I've read it all,

13  but it's a big stack.  I understand the general drift of this

14  type of problem, but I'd like to hear the -- we'll start with

15  the plaintiffs.

16          I have about 45 minutes of time, so we've got to wind

17  this up a little bit before 2:00.  All right.  So take about

18  ten minutes and give me the basic summary.  Then we'll hear ten

19  minutes from the other side.  And then we'll get into a

20  free-for-all.

21          MR. PADUANO:  Thank you, your Honor.  Your Honor,

22  good afternoon.  Your Honor, we seek -- plaintiff seeks a very

23  limited injunctive relief.  Plaintiff seeks an injunction to

24  preserve the status quo until such time as the parties appear

25  before FINRA for the mandatory arbitration, as required under

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

4

1   the securities and exchange rules and regulations.

2           THE COURT:  When will that arbitration begin?

3           MR. PADUANO:  It's a complicated answer, but if the

4   Court enters an injunction, what happens under the FINRA rules

5   is that in New York, the case is processed.  And within 15 days

6   from the injunction, under the rules, the arbitration panel

7   convenes and considers the issue of injunctive relief.  And

8   it's the only situation I'm aware of where arbitrators have the

9   right to -- they get to vacate.  They get to modify.  They get

071010_WHA_2

10    to expand whatever the Court's order is.

11        However, if there is no injunction entered by the

12    District Court -- and we can only obtain an injunction from a

13    State or District Court -- under the rules, the arbitration

14    proceeds in the ordinary course.  And, quite frankly, it won't

15    be heard until the second or third quarter of 2009 -- I'm

16    sorry -- 2008.  I apologize, your Honor.

17        So if there's an injunction, it's expedited

18    arbitration before FINRA on the merits.  And all aspects of

19    relief available to the parties are heard before three

20    arbitrators who are qualified and selected by FINRA -- two

21    members of the public, one industry person -- convened here,

22    probably in San Francisco.

23        THE COURT:  Is the hearing on the merits actually

24    expedited, too?

25        MR. PADUANO:  It is, your Honor.  Under the rules,

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

5

1    it's not as quick as 15 days.  We start on the 15th day.  The

2    arbitrators have complete authority to make a stay where they

3    schedule other dates.  And typically what happens, frankly, is

4    it's bifurcated as to issues of injunctive relief and other

5    issues, because counterclaims come in, issues of money come in,

6    things like that.

7        THE COURT:  And the 15-day thing -- can the

8    arbitrators expand as well as modify in both directions the

9    injunctive relief?

10        MR. PADUANO:  Yes, they can do anything they want.

11    They have complete authority.  They have authority where they

12    can refer the parties -- both the firms and individuals -- to

Page 4

071010_WHA_2

13  discipline before FINRA enforcement if it believes something

14  untoward has really happened.

15        THE COURT:  Does everyone agree that they're subject

16  to FINRA here?

17        MR. PADUANO:  We are, your Honor.  I think there's no

18  dispute as to that.

19        MR. MENNEMEIER:  I don't think there's any dispute as

20  to that, your Honor.

21        THE COURT:  All right.

22        MR. PADUANO:  Simply to get us before the

23  arbitrators.  The contracts the defendants have signed here --

24  Mr. Slayden, Ms. McJilton, Ms. Gilseth, Ms. Stromgren --

25  require that we arbitrate; require that the matters be

1  arbitrated.  And we simply seek now to hold them to the

2  signatures that they placed on documents here.

3        Mr. Slayden -- just briefly as to the facts, if the

4  Court's read the papers, he's the manager.  He was the person

5  in Santa Rosa.  It's a 4,000 square foot or so office.  It's

6  completely deserted now, except for a gentleman who is part

7  time, and one other producer.  There's no one left.

8  Mr. Slayden took the producers here, the operations manager,

9  the wire operator, who -- without whom no trades take place,

10  and moved them three floors above.  They're now on the fourth

11  floor of the same building.

12        THE COURT:  What became of the files and records and

13  customers?

14        MR. PADUANO:  Well, we know that something of their

15  files and records were left behind.  And there are files and

071010_WHA_2

16  records taken.  We know because, in the Court's own

17  supplemental declaration last night, Mr. Mennemeier has told us

18  that certain materials were taken; things that were only

19  accessible through the A.G. Edwards' system; things called

20  "browse lists," and other confidential information concerning

21  clients.

22       What's happened here -- and we're not guessing.  We

23  know that what's happened is the defendant has taken this

24  information -- that is, concerning the clients, concerning the

25  business, concerning their contact information, their holdings

                              Lydia Zinn, CSR,  RPR
                     Official Reporter -  U.S. District Court
                                 (415)  531-6587

                                                              7

1  and the like -- and used that information prior to the time

2  they left.

3       So Mr. Slayden leaves on September 20th.

4  Ms. Stromgren was -- and the other four leave on the same day.

5  Ms. Stromgren leaves on October 1st.  Ms. Stromgren has ACAT

6  forms.  And we've attached them to the declaration, one.  That

7  actually hit the same day, with the transfer going to Stifel.

8       Mr. Slayden's customers then were transferring

9  accounts the very day he joined Stifel; the first business day,

10  and thereafter.

11       So what's happened -- the ACAT process -- is it's a

12  paper process.  It's not electronic.  It's a beautiful, early

13  19th century process.  It's a -- four different forms that

14  customer must sign for each account in original ink.  The

15  customer gets that in hand, and the customer delivers it back

16  to the broker.

17       And the broker here then sends it to St. Louis where

18  Stifel, Nicolaus and A.G. Edwards are located.  They have an

071010_WHA_2

19  outgoing an incoming ACATs department.  And what happens is, as

20  it's attached to the declaration, this wire transfer takes

21  place that takes days.

22          In this situation, we know that the defendants took

23  information, because they could not possibly have gotten these

24  forms to the clients so quickly.  And, as to Ms. Stromgren, as

25  we've attached to the declaration, it happened on the same day.

                        Lydia Zinn, CSR,  RPR
            Official Reporter -  U.S. District Court
                        (415)  531-6587

                                          8

1  And the ACAT started to happen on the next day, next day, next

2  day.  And so we know it was in process in advance.

3          THE COURT:  Have all of the customers been stolen

4  away?  Fifty percent?  Ten percent?  What percent?

5          MR. PADUANO:  It changes all the time, the count.

6  And we don't know.  It's about 250 or so, out of about 1,400

7  accounts.  That's what's been taken thus far.  They come in

8  every day, all the time.  And I want to make --

9          THE COURT:  Well, how -- what happens when a customer

10  calls up and says, I want to make a trade, and your office is

11  closed?

12          MR. PADUANO:  Oh, the offices aren't closed.

13          THE COURT:  You said there was only one guy left.

14          MR. PADUANO:  There are two people left.  There are

15  people who have come from other offices, from Napa, are now

16  populating that branch.  They're trying.  It's a big struggle.

17          THE COURT:  In other words, there's some out-of-town

18  recruits that come in, to fill the gap?

19          MR. PADUANO:  Trying, yes.

20          THE COURT:  So all right.  So when somebody calls up

21  and says I want to make a trade, they say, "Fine.  We'll do it

071010_WHA_2

22    for you"?

23            MR. PADUANO:  Absolutely.

24            THE COURT:  What happens when they say, "Well, what

25    happened to Slayden"?

Lydia Zinn, CSR,  RPR
Official Reporter - U.S. District Court
(415)  531-6587

9

1            MR. PADUANO:  They're told they're gone.  They're

2    giving out a telephone number.  Frankly, your Honor, they're

3    giving out the telephone number.  The customers have all been

4    contacted by the defendants.  They've been told where they can

5    be found.  A.G. Edwards is telling these people -- the

6    customers -- that the brokers have left.

7            So I don't -- I want to make clear what we're not

8    trying to do is injure the customers in any way.  We're trying

9    to protect A.G. Edwards.  There are $300 million in assets that

10   Mr. Slayden and his little team here manage.  Those assets are

11   in play.  The customers ultimately get to do whatever they

12   want.  I don't stand in front of the Court, asking the Court to

13   interfere in the way that anyone directs their investments at

14   all.

15           We do stand here with a request that these defendants

16   be held to the agreements they signed, and they be required to

17   return the information they took back from us.

18           More important, however, Mr. Slayden's only taken two

19   producers so far.  He was the manager.  Well-regarded man.  And

20   these people, quite successful people there.

21           Mr. Slayden not only managed that branch and could

22   take other people and employees from that branch -- and,

23   granted, there are not many left, because he took the

24   nucleus -- but Mr. Slayden gets paid as a manager to populate

071010_WHA_2

25  his new office.  He must find new producers.  And his natural

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

10

1  market to recruit new producers are A.G. Edwards brokers.

2          THE COURT:  But they're all gone now.

3          MR. PADUANO:  Your Honor, there are many, many

4  A.G. Edwards brokers in northern California.  Mr. Slayden, as,

5  now, a branch manager for Stifel, Nicolaus, will be

6  incentivized by his compensation scheme as a manager to recruit

7  people to come to Stifel and Nicholas.

8          A.G. Edwards agreements Mr. Slayden signed says that

9  for a year, once you leave us, you can't directly or indirectly

10  solicit or be involved in moving any of our employees -- any of

11  our employees -- to a competitor.

12          THE COURT:  That's what his agreement says --

13  Slayden's agreement says.

14          MR. PADUANO:  Yes, your Honor.

15          THE COURT:  I thought some of them said it, and some

16  of them didn't.

17          MR. PADUANO:  He's the only manager.  Says that

18  really clearly, indisputably, when he pulled out Ms. McJilton,

19  Ms. Gilseth, and Ms. Stromgren and the wire operator.  We

20  submit respectfully that on the merits.  Ultimately, before

21  FINRA, we'll be able to prove conclusively that these people

22  did not come up with the bright idea to move upstairs with

23  their branch managers and set up a new operation for a

24  competitor that no one had ever heard of.  Stifel, Nicolaus has

25  no presence in northern California until very recently, where

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

071010_WHA_2

11

1  they're trying to, quite frankly, have their way with

2  A.G. Edwards' employees in light of its acquisition by Wachovia

3  Corporation.

4          So we think that the appropriate thing is to simply

5  hold these people to their contracts until such time as we get

6  before the arbitrators.

7          The reason we need that -- it's not simply a question

8  of money.  There won't be, at the end of the day, precise

9  knowledge ever as to how we've been damaged, but as the Court

10  can imagine, Mr. Slayden's already wiped out literally the

11  branch, and caused huge problems.  Those $300 million in

12  assets -- do we lose all of it?  Some of it?  We don't know,

13  but we have a real problem with that by taking the employees,

14  though.  You can imagine.

15          We now have empty office space there.  There are all

16  kinds of problems.  Clients are very unhappy with this market

17  going up, down, and sideways.  And they're A.G. Edwards

18  producers.  A.G. Edwards has custody of assets under

19  A.G. Edwards' statements.  It's in disarray, and it's wrong.

20          And if Mr. Slayden's going to go out now and recruit

21  other people from other neighboring A.G. Edwards branches, that

22  is going to greatly compound the problem.  And that's why he

23  signed that contract.  This is not a low-level employee.  This

24  is a highly compensated person, a very successful person, a

25  person held -- was held, quite frankly, in high regard in the

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

12

1  organization.  And he's done this to enrich himself.

2          That's fine.  He gets to do whatever he wants.  He

071010_WHA_2

3  can't breach his agreements.  And we think the arbitrators hold

4  him to his agreements very carefully.

5         There's no hardship to the defendants by what we

6  seek.  These people were free to stay and work at Stifel,

7  Nicolaus.  We're not asking them to turn around.  We're not

8  asking them to go home.  They get to serve whatever clients

9  they transfer.

10         THE COURT:  What if Slayden does not contact

11  somebody, but an employee contacts him and says, "I want to get

12  a job with you."  What's wrong with that?

13         MR. PADUANO:  Shouldn't be involved directly or

14  indirectly.  If they want to go work for Merrill Lynch, Morgan

15  Stanley, U.B.S., they're free to go.  There's nothing that we

16  can do.  These are professionals, successful people.  They

17  manage assets.  If they want to go, they get to go.

18         One thing we can't have happen, though, is one of our

19  former managers -- somebody who has our business plan both in

20  paper form and in his head -- sitting there, deciding which

21  producers are good, which producers are bad, which ones should

22  come, which ones shouldn't.  He's not supposed to be involved

23  in the process at all.  His answer should be, "I'm sorry, sir.

24  I can't have that conversation with you, because I have a

25  contract in my industry."  By the way, it is based on:  my word

1  is my bond.  We do transactions in the industry as based on the

2  transaction that people call up and say, just like the Court

3  said, I want to sell.

4         THE COURT:  Where can I find that contract in all

5  this?

071010_WHA_2

6          MR. PADUANO:  Mr. Slayden's contract?

7          THE COURT:  Yeah.

8          MR. PADUANO:  It's attached, your Honor, to

9    Mr. Hatcher's -- excuse me -- declaration.

10          Mr. Slayden's contracts are Exhibit A.

11          THE COURT:  And where is the provision that says what

12   you say it says?

13          MR. PADUANO:  I'll point through.  One second,

14   your Honor.  Paragraph 1, your Honor, has confidentiality

15   provisions regarding policies.  Paragraph 15 and 21 refer to

16   client information.  Paragraphs -- I'm sorry.  I'm just missing

17   my --

18          THE COURT:  Where is the part where he leaves the

19   solicited employees?

20          MR. MENNEMEIER:  There's no such clause in that

21   contract, your Honor.

22          MR. PADUANO:  Ms. McJilton's got one in paragraph --

23          THE COURT:  I'm talking about Mr. Slayden.  Why did

24   you tell me there was one?

25          MR. PADUANO:  I'm sorry, your Honor.

                              Lydia Zinn, CSR,  RPR
                    Official Reporter -  U.S. District Court
                              (415)  531-6587

                                                              14

1          THE COURT:  Well, you told me that there was one.

2          MR. PADUANO:  I didn't refer to that document.  I

3    apologize, your Honor.

4          THE COURT:  He's the boss.  What difference does it

5    make if some secretary has such a clause?

6          MR. PADUANO:  Actually, Ms. McJilton was his business

7    partner.

8          THE COURT:  All right.  Business partner.  They're
                              Page 12

071010_WHA_2

 9  joint production numbers, but your Honor, he's the manager.  I

10  mean, he's walked out with these people.  Clearly he has a

11  fiduciary --

12            THE COURT:  I think you're trying to trick me.

13            MR. PADUANO:  Oh, your Honor, I apologize.

14            THE COURT:  You told me that the guy in charge had a

15  clause that said he could not solicit employees.  And now I

16  say:  where is it?  And you can't find it, because it's not

17  there.

18            MR. PADUANO:  Well, your Honor, let me -- let me try

19  and do it again.  I apologize.  Ms. McJilton's contract is the

20  one that's got it.  Mr. Slayden's agreement refers to the

21  policies and procedures that are set forth in --

22            THE COURT:  You said you wanted to hold them up to

23  their contract.  Well, fine.  Maybe that's what we should do,

24  but you can't read new things into the contract.

25            MR. PADUANO:  Sure, your Honor.  And if I point the

 1  Court to Exhibits, if I may, G and H, which also speak to

 2  confidentiality, that Mr. --

 3            THE COURT:  G.  I see G.  That's -- I can't tell what

 4  this is.  A.G. net something.  Internal use only.

 5            MR. PADUANO:  Yes, your Honor.

 6            THE COURT:  Where's the part that helps you?

 7            MR. PADUANO:  It talks about, your Honor, what is

 8  using for your own purpose the corporate opportunities,

 9  confidentiality -- there's information here that's required of

10  A.G. Edwards -- for your own purposes.  You're not supposed to

11  walk out the door with it.  And here Mr. Slayden has walked out

071010_WHA_2

12   the door with employees and people who are good.

13         THE COURT:  Am I looking at the right thing?  Is this

14   it?  Is this the document right here?  Is that what you're

15   talking about?

16         MR. PADUANO:  H, your Honor.  That's one of them.

17   That's I.  The Court has --

18         THE COURT:  Code of ethical conduct?

19         MR. PADUANO:  Yes.  Yes, your Honor.

20         THE COURT:  All right.  Which is the part that says

21   don't solicit employees?

22         MR. PADUANO:  One second, your Honor.

23         Your Honor, it's protection and proper use of company

24   assets.  It's on page 3 there.  It's the fair dealing.

25         THE COURT:  You haven't had -- employees haven't been

1   deemed to be assets since the 13th Amendment.

2         MR. PADUANO:  Well, your Honor, I mean, it's a

3   service industry.  Frankly, what will happen with these

4   producers is the clients eventually, if -- depending on the

5   client relationship, will follow these producers.  So these

6   were A.G. Edwards' assets under A.G. Edwards' management

7   largely; the $305 million still is, as of this time.  What's

8   happening is that Mr. Slayden and people that he's taken with

9   him are trying to move those assets to Stifel, Nicolaus.  And

10   frankly, your Honor -- excuse me -- these are -- we produced

11   one of the ACAT transfer forms.

12         THE COURT:  Well, listen to this.  Why did you leave

13   this part out?  I'm looking at it.  It says -- talks about the

14   assets.  And then it says, "These assets include but are not

071010_WHA_2

15  limited to," and here are the things that they say:

16  A.G. Edwards' physical and intellectual property, such as

17  confidential and proprietary information, capital equipment and

18  facilities, trademarks and service marks, technology, business

19  plans, trade secrets, new ideas, products and services,

20  copyrightable materials, and client and prospective client

21  lists.  Period.  It doesn't say "and our employees."

22          MR. PADUANO:  Well, your Honor, the Court read it

23  accurately, clearly.

24          I would suggest, though, that the document the Code

25  of Ethics, which this is -- both that section, the fair dealing

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

17

1  section, the references throughout here, including corporate

2  opportunities --

3          THE COURT:  I don't believe any of this until --

4  point it out to me.  Look.  You so far you've given me two

5  examples, and both of them are full of holes.  So show me

6  something in writing that says they cannot solicit -- I'm

7  talking about Slayden -- cannot solicit workers, human beings,

8  to come work for him.

9          MR. PADUANO:  Your Honor, there's not a document.

10  And I want to make clear.  Ms. McJilton, his business partner,

11  has that.

12          THE COURT:  All right.  Well, show me hers.  Then

13  maybe we enjoin her, but I don't know that you can enjoin him

14  on the worker front, anyway.

15          MR. PADUANO:  Your Honor, he does have fiduciary

16  duty.  Clearly, he's taken out these people.  Ms. McJilton, in

17  paragraph number --

071010_WHA_2

18      THE COURT:  That's not in your contract.  That's

19  just -- if it's true, it's only a matter of common law in

20  California.

21      MR. PADUANO:  Correct, your Honor.  Absolutely.

22      THE COURT:  If that's so important to you, you could

23  have put it in the contract, but you didn't.

24      MR. PADUANO:  But it's throughout his --

25  respectfully, it's implicit throughout his obligations as a

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

18

1  manager.  It's inconceivable he's maintaining his duty of

2  loyalty one day.  He's working on the first floor.

3      THE COURT:  Possibly true, but all that damage has

4  now been done.  Now that he's on the outside, he can solicit.

5      MR. PADUANO:  Your Honor, I think the damages --

6      THE COURT:  People call your people up at your law

7  firm all the time and solicit them.  They're not breaching any

8  fiduciary duty.

9      MR. PADUANO:  I have not had a contract with the

10  people that they can't solicit.  I don't have a code of ethics

11  that says others can't solicit; that outsiders can't.

12      THE COURT:  You show me any code of ethics.  Look.  I

13  know that in this business, A.G. Edwards solicits people from

14  other companies to come join them.  It's -- likewise, it goes

15  the other way.  So now that this guy is on the outside looking

16  in, he's no longer an insider.  He has no fiduciary duty.

17      Now, he had one at the time.  And I would say you

18  have a plausible case that he breached it, but that was then;

19  this is now.

20      MR. PADUANO:  I understand that, your Honor.  And we

071010_WHA_2

21  simply ask that the status quo that is --

22          THE COURT:  Status quo is where we are right this

23  moment.

24          MR. PADUANO:  -- that he shouldn't take any more

25  people.  And that's what he's trying to do, we submit.

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

19

1  Ms. McJilton, in Paragraph 29, is the language I refer to.

2          THE COURT:  Where is her contract?

3          MR. PADUANO:  Her contract is -- I'm sorry.  They all

4  look the same.  I'm sorry.

5          THE COURT:  Maybe Mr. Zachary knows.  Which one is

6  hers?

7          MR. PADUANO:  Looks like it's --

8          THE COURT:  All right.  I'm going to give you three

9  minutes.  We're out of time.

10          MR. PADUANO:  Sure.

11          MR. MENNEMEIER:  Hers is Exhibit E, your Honor.

12          THE COURT:  Number E.  All right.  Show me what her

13  paragraph is.

14          MR. PADUANO:  Paragraph 29.  Thank you.

15          THE COURT:  Paragraph 21?

16          MR. PADUANO:  Twenty-nine, your Honor.

17          THE COURT:  Twenty-nine.  Okay.  Well, that

18  definitely helps you as to her.

19          MR. PADUANO:  Ms. McJilton's got that contract.

20          THE COURT:  But that doesn't mean that he's bound by

21  that.  It's just that she's bound by that.

22          MR. PADUANO:  That's correct, your Honor, but I don't

23  suggest otherwise.

Page 17

071010_WHA_2

24          THE COURT:  What's her name?

25          MR. PADUANO:  McJilton.

1          THE COURT:  McJilton.  Okay.

2          MR. PADUANO:  Yes.  Your Honor, I should be clear.

3    These are the contracts, also on a very quick basis, we were

4    able to identify and find Mr. Slayden was our branch manager,

5    so we did entrust this process to Mr. Slayden.

6          THE COURT:  Well, I just can't speculate that you've

7    got more documents, because you have to enlarge --

8          MR. PADUANO:  Absolutely correct, your Honor.

9          THE COURT:  All right.  I want you to get off the

10   workers for a minute, and let's focus on the accounts.  And the

11   way I understand this works, because I've got some accounts, if

12   I want to go from Firm A to Firm B, I have to fill out a form,

13   and then submit it.  So until that's all done, the original

14   firm keeps all of my records and accounts, and has the

15   fiduciary duty, and so forth.  So --

16         MR. PADUANO:  Sadly, your Honor.

17         THE COURT:  All right.  So the -- you say 240 have

18   left, out of 1,400?

19         MR. PADUANO:  Approximately, your Honor.

20         THE COURT:  Well, then, that may be something to talk

21   about in terms of stopping the solicitation on those accounts.

22         Okay.  I need to hear from the other side for a

23   second.

24         MR. PADUANO:  Thank you, your Honor.

25         MR. MENNEMEIER:  Ken Mennemeier, your Honor.  Good

071010_WHA_2
Official Reporter -  U.S. District Court
(415)  531-6587

21

1    afternoon.  Before I start, may I ask:  we submitted papers at
2    10:00 o'clock --
3            THE COURT:  I read -- they weren't much, but I read
4    it.
5            MR. MENNEMEIER:  Good.  I'm glad to hear that.
6            Could I ask you to go with me to our declaration, the
7    declaration of James Lee?  I want to start there with you.  And
8    there's a point I want to emphasize there.
9            THE COURT:  Go right ahead.  Right here.
10           MR. MENNEMEIER:  With James Lee's declaration, we
11   have attached to that, your Honor, the single exhibit.  And I
12   want to look at the first page of the exhibit.  You'll see that
13   it's an e-mail.  And in upper right-hand corner, my copy says
14   page 4 of 6.
15           THE COURT:  Is that the one where -- this is it?
16           MR. MENNEMEIER:  Yeah, that's the right page,
17   your Honor.
18           And what I want to call the Court's attention to --
19   well, before I call the Court's attention to the language here,
20   I want to point out what this is.  This is an e-mail memo that
21   went out to people at A.G. Edwards.  And it went out by a guy
22   by the name of Gene Diederich, which is high-level management
23   at A.G. Edwards.  He is the director of branch operations.
24   He's the guy in charge of all of the branches.
25           And the language in here I want to call your

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

22

071010_WHA_2

1    attention to is the language at the bottom of this page, where

2    it says, "Wachovia Security shares our belief that the FC" --

3    that is the financial consultant; not the firm -- "owns the

4    client relationship."

5           Now, your Honor, I need to put that in context for

6    you; the context of this comment, and the context of the

7    lawsuit.  And they're related.

8           Your Honor, on -- at the end of May, Wachovia

9    announced that it was acquiring A.G. Edwards.  And it's -- it's

10   the backdrop of that which creates this lawsuit.  This is now

11   the second lawsuit that A.G. -- has been filed by Wachovia in

12   the name of A.G. Edwards against a former employee who has left

13   to join the competitors.

14          THE COURT:  Why does that matter?

15          MR. MENNEMEIER:  Well, it doesn't matter legally,

16   your Honor, but I think it gives you context in what -- in --

17   as to what this dispute is about.

18          From my perspective, this dispute is about employee

19   mobility and protecting these employees' right to move within

20   the confines of what their contracts provide for and what the

21   law provides for.  And I'll get -- and I'll address that to

22   you, but these people are free to move.  And that's what this

23   lawsuit is about.

24          Now, you were asking Mr. Paduano about some of the

25   contract clauses.  And the fact of the matter is with regard to

1    soliciting clients for business, there is no contract provision

2    for three of them.

3           For Cathy McJilton, her contract has such a clause,

071010_WHA_2

 4   but your Honor, her position is such that she is not involved

 5   in soliciting people.  Her position is as a sales assistant.

 6   It's called "registered sales assistant."  And she provides

 7   service to clients.  Her responsibility is to respond to client

 8   calls and provide service to clients.  She is not soliciting

 9   clients to move.  And there's no showing to this Court --

10   absolutely no showing before you -- that she's been engaged in

11   any solicitation that would be in violation of that clause in

12   her contract.

13         As to the others, your Honor, there is no

14   nonsolicitation clause as it relates to customers.  So there's

15   absolutely nothing wrong, once these people have left, about

16   them approaching people that they --

17         THE COURT:  Well, if they took the lists or made up

18   lists before they left based on the company's records, that

19   would be wrong.

20         MR. MENNEMEIER:  No, no, it's not, your Honor.  And

21   here is why.  And there are a couple of points to be made on

22   that.

23         First of all, under California law, Moss Adams case

24   in particular, the employees -- when employees -- when they

25   leave an employer, that's -- where the client relationship is a

                          Lydia Zinn, CSR,  RPR
                   Official Reporter -  U.S. District Court
                              (415)  531-6587

                                                        24

 1   personal service relationship -- Moss Adams was accounting;

 2   this is financial and investment services.  When an employee

 3   leaves, the employee is entitled to notify people with whom he

 4   had direct business dealings for his former employer that he is

 5   now affiliated with a new employer and as part of that he's

 6   entitled to have names and contact information including

                          Page 21

071010_WHA_2

7   telephones and addresses.  That's the Moss Adams case,

8   your Honor, cited in our papers.

9        So the first point, your Honor, is:  these people are

10  entitled, as a matter of law, to take that contact information

11  with them.

12       Now, the second point I would make, your Honor, is.

13       THE COURT:  Wait a minute.  Is that all that they

14  took?  What else did they take?  You'd better -- I'm going to

15  tell you now that there's going to be prompt discovery starting

16  this week.  And your people are going to have to sit for a

17  deposition and say under oath what they took.

18       MR. MENNEMEIER:  I appreciate that, your Honor.

19       THE COURT:  So I want to know now what it is they

20  took.

21       MR. MENNEMEIER:  Well -- and I will tell you, to the

22  extent that I have been told by my clients.

23       Sam Slayden has three types of documents that he

24  took.  And I shared all of this with Mr. Paduano in a letter.

25  There's something called a "browse list," which is a

                              Lydia Zinn, CSR,  RPR
                    Official Reporter -  U.S. District Court
                              (415)  531-6587

                                                          25

1   multipage --

2        THE COURT:  Let me see that.  Is that a copy of it?

3        MR. MENNEMEIER:  This is the only copy I have,

4   your Honor.

5        THE COURT:  I'll give it back.

6        MR. MENNEMEIER:  And, your Honor, as you begin to

7   look at that the first 20 pages of that -- 20 pages of what I

8   handed you is a browse list.  And then there are a couple of

9   other pages at the back which are exemplars of other types of

071010_WHA_2

10  documents that I can describe to you.

11      THE COURT:  Well, it can't possibly be that he was in

12  touch with all of these people.

13      MR. MENNEMEIER:  Your Honor, my understanding is that

14  the way this works is that when a broker moves, he typically

15  provides his new employer the names and addresses of his

16  clients.  And then a mailing goes out to those clients,

17  announcing the new affiliation.

18      THE COURT:  There's no address on here anyway.

19      MR. MENNEMEIER:  The addresses, your Honor, came from

20  a different document.  And there's an exemplar at the back of

21  that which I believe is called an "account inquiry sheet."  And

22  that's a page which does have address information on it for --

23  I think it's the second-to-the-last document in that stack.  Is

24  that the one that says at the top, your Honor, "Account Inquiry

25  Sheet"?

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

26

1       THE COURT:  It says "Account Inquiry."

2       MR. MENNEMEIER:  That's the document I'm referring

3   to.

4       THE COURT:  Yeah, but this has got a lot more

5   information on it than just names and address.

6       MR. MENNEMEIER:  I understand that, your Honor.  And

7   I think what the testimony would be is that the brokers, to the

8   extent that they took those documents, took those documents for

9   the purpose of having the address and the contact information

10  in order to facilitate the mailing, and that they haven't made

11  any other use of that document.

12      THE COURT:  Doesn't look good.  I just have your word

Page 23

071010_WHA_2

13    for it.

14        MR. MENNEMEIER:  Well, your Honor, I got notice of

15    this hearing not very late yesterday -- well, yesterday

16    morning.  And I haven't had --

17        THE COURT:  This other document has Titan account,

18    I.R.A., joint, so forth.  It's got home phone number, business

19    phone.

20        You don't need phone numbers in order to send out

21    these notices.

22        MR. MENNEMEIER:  No, your Honor.  And you're bringing

23    me to my second point.  And this is something that we addressed

24    briefly in the papers, but didn't have the opportunity to make

25    as clear as I would like.

                              Lydia Zinn, CSR,  RPR
                   Official Reporter -  U.S. District Court
                              (415)  531-6587

                                    27

1        There is something in the business called the

2    "protocol for departing brokers."  And bear with me one second.

3    The document is called "Protocol for Broker Recruiting."

4        Now, this is a document that A.G. Edwards signed on

5    to in March of 2007.  It's an agreement among brokerage firms

6    that sign up for this protocol which recognize a protocol, if

7    you will, for what may occur when brokers leave.  And under

8    this protocol, the firms that accept it agree that departing

9    brokers, when they move to another firm that's a signatory of

10   the protocol, are permitted to take contact information,

11   including names, phone numbers, addresses, for the purpose of

12   notifying clients that they have moved.  And my understanding

13   of the protocol is that they're even permitted to contact those

14   clients and ask them to move their business.

15        Now, I can share --

071010_WHA_2

16          THE COURT:  Where does that understanding come from?

17  Does it say that?  Give me the -- point me to the protocol

18  paragraph you're talking about.

19          MR. MENNEMEIER:  This one.  I have extra copies of

20  it, your Honor, so I'll share one with opposing counsel.

21          THE COURT:  I'll hand this other thing back to you.

22  I'm going to hold on to it more for a moment.

23          All right.  I have now the protocol that A.G. Edwards

24  has signed onto, according to you.  Where does it say what you

25  just told me?

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

28

1          MR. MENNEMEIER:  Your Honor, at the top of the second

2  page --

3          THE COURT:  Okay.

4          MR. MENNEMEIER:  -- the very first couple lines, it

5  says,

6                  Registered representatives that comply

7              with this protocol would be free to solicit

8              customers that they have serviced while at

9              their former firms, but only after they

10             have joined their new firms.

11         THE COURT:  Well, it goes on to say a firm would

12  continue to be free to enforce whatever contractual statutory

13  or common law restrictions exist on the solicitation of

14  customers to move their accounts by departing R.R. before he or

15  she -- before he or she has left the firm.

16         MR. MENNEMEIER:  Yes.

17         THE COURT:  Well, is it true that your people started

18  soliciting accounts before they left?

Page 25

071010_WHA_2

19          MR. MENNEMEIER:  I don't know what the evidence is on

20  that, your Honor.  My understanding --

21          THE COURT:  Is it something that you have tried not

22  to learn?

23          MR. MENNEMEIER:  No, your Honor.

24          My understanding is that --

25          THE COURT:  It sure sounds like it -- like that's

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

29

1   what they had to be doing.  I know enough about how this works

2   that people can't move their accounts as quickly as your people

3   seem to have gotten them to do it without starting on it

4   before, giving them some lead time.

5           MR. MENNEMEIER:  My understanding, your Honor, is

6   that they had the contact information, they provided it to

7   Stifel, and that mailings went out.  And with the mailings went

8   out -- with the mailings went the form that would facilitate

9   the transfers of the accounts, but my understanding --

10          THE COURT:  When did that happen?

11          MR. MENNEMEIER:  My understanding is that the mailing

12  went out after they joined their new firm.

13          THE COURT:  And how did some people sign up so

14  pronto?

15          MR. MENNEMEIER:  I don't know the answer to that,

16  your Honor.  And we'll obviously get to the bottom of that when

17  we do the discovery.

18          THE COURT:  But even what you've pointed me to in

19  this protocol doesn't say that the R.R.s can take with them

20  things that look like a browse list --

21          MR. MENNEMEIER:  No.

Page 26

071010_WHA_2

22          THE COURT:  -- which has got home phone numbers,

23  business phone numbers, whether it's active or not, whether

24  it's primarily by e-mail, and --

25          MR. MENNEMEIER:  Well, your Honor, in that regard,

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

30

1  let's go to the first page of the protocol.  And I want to call

2  your attention to the second paragraph, the first line of the

3  second paragraph, which says,

4              When registered representatives move

5              from one firm to another, and both firms

6              are signatories to this protocol, they may

7              take only the following account

8              information -- client name, address, phone

9              number, e-mail address, and account title

10             of the clients that they service while at

11             the firm -- and are prohibited from taking

12             any other documents or information.

13          So, your Honor, my point to put these two concepts

14  together is this protocol recognizes, as does the Moss Adams

15  case in California case law, that when brokers move from one

16  firm to another, they are free to contact people they served at

17  their prior firm.  And to facilitate that contact, they're free

18  to take account information with them, such as names,

19  addresses, and phone numbers.

20          Oh, and Steve is pointing out to me that I need -- I

21  thought I had mentioned earlier that I want you to know that

22  Stifel, Nicolaus is not a party to the protocol.  A.G. Edwards

23  is; but Stifel, Nicolaus is not.  So I don't want the Court

24  to --

Page 27

071010_WHA_2
25          THE COURT:  Well, does this, then, even apply?

1          MR. MENNEMEIER:  It doesn't apply, your Honor, to the

2   people who have moved for the purpose of invoking the protocol

3   against them; but it applies to the hearing that has us before

4   you today for this reason.  We're here for you to decide

5   whether to issue a T.R.O., your Honor.  And one of the

6   standards for that is:  has there been or will there be

7   irreparable harm?

8          Now, I cited to you in our papers a case by the name

9   of Merrill Lynch versus Brennan, decided, I think, earlier this

10  year.  Very similar situation to this, where brokers left

11  Merrill Lynch, and Merrill Lynch sued them.  And in that

12  instance, Mr. Paduano represented the brokers.  And in that

13  case, your Honor, Mr. Paduano was successful in arguing that

14  because Merrill Lynch was a party to the protocol, the fact

15  that the protocol permits brokers to take names, address

16  information, and to make these solicitations, it precluded the

17  Court from determining that such solicitation would constitute

18  irreparable harm.

19          THE COURT:  But you aren't even a party to the

20  protocol.

21          MR. MENNEMEIER:  I understand that, your Honor.

22          THE COURT:  And you are making a big deal in your

23  papers about exactly what the contract said.  And now you want

24  to bind -- you want to hold them to the protocol without you

25  being part of the protocol.  That's unconscionable.  Here.

071010_WHA_2

32

1  Come take this offending document back.  This -- this is
2  terrible, what you're trying to do.  That's as bad as what
3  Counsel was trying to do, to make me think provisions were in
4  the contract.  You're trying to make me believe that that
5  protocol applies in this case.
6          MR. MENNEMEIER:  Your Honor, I'm sorry if I did not
7  make myself clear.
8          THE COURT:  Well, you sure didn't.  All right.  Have
9  a seat.  I'm ready to rule.  Time has run out.
10          Here's what we're going to do.  All right.  I'm going
11  to give some relief, but not as much as everybody wants.
12          First of all, there's going to be two depositions per
13  side, up to one day.  And this is all going to take place
14  before the 15-day time fuse runs out.  So if you need to come
15  back in here and get more relief based on the depositions,
16  fine.
17          So since you're the plaintiff, you get to take your
18  two depositions first.  Who do you want to take?
19          MR. PADUANO:  Your Honor, we'll take -- may we take
20  Mr. Slayden's deposition and, your Honor --
21          THE COURT:  Slayden.
22          MR. PADUANO:  Mr. Slayden, your Honor.
23          THE COURT:  Who else?
24          MR. PADUANO:  I don't want to ask the Court to
25  reserve, but I believe I want to take the person at Stifel,

                        Lydia Zinn, CSR,  RPR
               Official Reporter -  U.S. District Court
                           (415)  531-6587

33

1  Nicolaus who hired Mr. Slayden.
2          THE COURT:  Who is that?

071010_WHA_2

 3          THE COURT:  All right.  Who is it, back there?

 4          MR. HUGHES:  I think Mr. Mennemeier knows.

 5          MR. MENNEMEIER:  I believe it's a man by the name of

 6  John Lee.

 7          THE COURT:  Lee?

 8          MR. MENNEMEIER:  John Lee.

 9          THE COURT:  All right.  So Slayden is going to be

10  deposed Friday this week, starting at 9:00 a.m.  Where do you

11  want that deposition to take place?

12          MR. PADUANO:  At the office of Keesal, Young & Logan,

13  your Honor, if that's --

14          THE COURT:  Where is that?

15          MR. PADUANO:  Four Embarcadero.

16          THE COURT:  Where does Mr. Slayden live?

17          MR. MENNEMEIER:  He works in Santa Rosa.  I don't

18  know what his residence is, but I believe it's Sonoma County.

19          THE COURT:  All right.  That's close enough.  He can

20  come to that office.  9:00 a.m.  Okay.  We'll come back to

21  documents in a minute.

22          Mr. Lee will be deposed on Monday, 9:00 a.m., same

23  place.

24          MR. MENNEMEIER:  Now, Mr. Lee, your Honor, lives in

25  Auburn/Sacramento area.

                         Lydia Zinn, CSR,  RPR
            Official Reporter -  U.S. District Court
                         (415)  531-6587

                                34

 1          THE COURT:  Well, your office -- your office is in

 2  Sacramento.  All right.  We'll take his deposition in

 3  Sacramento.  So we'll take that -- you take the deposition in

 4  Mr. Mennemeier's office Monday, 9:00 a.m.

 5          Okay.  Mr. Mennemeier, what deposition do you want to

                         Page 30

071010_WHA_2

6    take?

7            MR. MENNEMEIER:  May I have just a second,

8    your Honor?

9            Your Honor, I would like the deposition of

10   Gene Diederich, director of branch operations.

11           THE COURT:  Diederich?

12           MR. MENNEMEIER:  Yes, sir.  D-i-e-d-e-r-i-c-h.

13           THE COURT:  All right.  Where does he live?

14           MR. MENNEMEIER:  I believe he's in the St. Louis

15   area.  St. Louis, Missouri, your Honor.

16           THE COURT:  Normally, he's got to be deposed back

17   there.  Do you want to bring him out here?

18           MR. PADUANO:  I don't know if he knows anything about

19   the facts.  I can tell you --

20           THE COURT:  Doesn't matter.  You're not going to get

21   any depositions unless they get two.

22           MR. PADUANO:  Your Honor, he's the regional

23   president.  In San Francisco, actually, Mr. Hatcher --

24           THE COURT:  Who do you represent knows the most about

25   this?

                                  Lydia Zinn, CSR,  RPR
                      Official Reporter -  U.S. District Court
                                  (415)  531-6587

                                                          35

1            MR. PADUANO:  Mr. Hatcher.  Before this Court --

2            THE COURT:  Why can't they take Diederich?

3            MR. PADUANO:  I've never spoken to the man.  I don't

4    know what, if anything, he knows about this at all.  I can tell

5    the Court he didn't contribute at all to this case.

6            THE COURT:  Why do you want to take his deposition?

7            MR. MENNEMEIER:  Your Honor, because he's the person

8    who made the comment reflected on the attachment to the Lee

071010_WHA_2

 9    declaration.

10            THE COURT:  I think that's good enough.  I read that.

11    It hurts your case.  I don't blame them for wanting to.

12            All right.  So you have to confirm tomorrow all these

13    depositions that you want to take.  They don't happen unless,

14    by tomorrow at 3:00 p.m., you confirm that Diederich is going

15    to be available in St. Louis at a place to be determined on

16    Wednesday of next week at 9:00 a.m.

17            And if you don't confirm that in writing by 3:00 p.m.

18    tomorrow, these other depositions that you want to take are

19    off.

20            MR. PADUANO:  Understand, your Honor.

21            THE COURT:  All right.  You want to take Hatcher's

22    deposition?

23            MR. MENNEMEIER:  Yes, sir, your Honor.

24            THE COURT:  All right.  Hatcher will be Friday of

25    next week, 9:00 a.m.  And he's here in town, right?

                          Lydia Zinn, CSR,  RPR
                  Official Reporter -  U.S. District Court
                            (415)  531-6587

                                                            36

 1            MR. PADUANO:  I believe he is, your Honor.

 2            THE COURT:  All right.  Where do you want to take

 3    him?  It's going to have to be here in -- how about at their

 4    law office?

 5            MR. HUGHES:  Sure.

 6            MR. MENNEMEIER:  In Mr. Hughes' office.

 7            THE COURT:  Hughes' office.  9:00 a.m.  Sure.  Okay.

 8    Now, those are the four depositions.

 9            I want -- for the Slayden deposition, Mr. Slayden has

10    got to bring with him to the deposition every single document

11    he took with him; every single computer file he took with him.

071010_WHA_2

12  Any information of any type that he took with him, he's got to

13  bring.

14          Mr. Lee's got to bring to the deposition everything

15  that he got, all information that he got from Mr. Slayden at or

16  about the time or before the transition.

17          Okay.  Now, that's the discovery plan.  The Court's

18  going to order that FINRA start this in 15 days.  I know

19  they're not a party to the case, but I'm going to be very

20  disappointed if anyone throws a monkey wrench in the

21  proceedings.  So they got to get going in 15 days.  If not, you

22  come back to see me.  All relief will be vacated.

23          MR. MENNEMEIER:  I'm sorry.  Fifteen days from what,

24  your Honor?

25          THE COURT:  From right now, because I'm going to

                                    Lydia Zinn, CSR,  RPR
                        Official Reporter -  U.S. District Court
                                      (415)  531-6587

                                          37

1  issue a T.R.O. of sorts.  Here's what the T.R.O. is going to

2  say.

3          With respect to soliciting workers, there's no

4  relief, except for the one person who had a contract.  And that

5  person's name was what?

6          MR. MENNEMEIER:  Cathy McJilton, your Honor.

7          THE COURT:  All right.  She's barred from soliciting

8  employees directly or indirectly who used to work for or still

9  work for A.G. Edwards or do work for A.G. Edwards; now,

10  Wachovia.

11          On the other hand, the other people are not barred

12  from soliciting former employees.  This is without prejudice to

13  the plaintiff proving up later that somebody violated their

14  fiduciary duties while they still were with A.G. Edwards, and

                                    Page 33

071010_WHA_2

15 getting billions of dollars in punitive damages; but right now,

16 they're no longer under any fiduciary duty, and the Court

17 doesn't buy the argument that there's this vague code of

18 conduct that -- and that people are chattel, and so forth.  So

19 the Court doesn't buy that, at least, on this record.

20        Now, with respect to the clients of the firm, the

21 Court can't do anything about any solicitation that went out

22 before today; but starting today, there will be no more

23 solicitation by any of these people who left A.G. Edwards.

24 Zero.

25        And -- but any solicitation that went out prior to

1 2:00 o'clock today, fine.  Starting 2:00 o'clock today, there

2 won't be any more solicitations until FINRA -- F-I-N-R-A -- or

3 this Court modifies the order to allow it.

4        And the reason for that is that I recognize that when

5 somebody goes from personal services to A -- goes from Firm A

6 to Firm B, normally, they can give notice.  It sounds like

7 that's already happened here anyway, but I'm concerned with the

8 volume of information that was taken, and this idea that the

9 protocol applied in the case, when it turns out to be a

10 completely phony argument.

11        Fifteen days.  We're not going to exacerbate the

12 situation.  And no more solicitation.

13        Now, I want to be clear.  If a client calls up these

14 guys that left -- these men and women that left -- and says,

15 "We want to go with you.  We don't want to stay with

16 A.G. Edwards.  We like you," no problem.  They can do that.

17        And at that point, these four defendants can say,

071010_WHA_2

18  "Great.  We want to have you.  Here's the paperwork."  That's
19  all right; but what the four can't do is affirmatively contact
20  them and affirmatively solicit prior to a client of the
21  plaintiffs contacting them and asking for them to change firms.
22  So it's okay if the client makes the -- initiates the contact,
23  but it's not okay if the four defendants do so.
24       Now, it will be -- even though -- even though --
25  let's see.  What's the name of this company?  Slayden?

                          Lydia Zinn, CSR,  RPR
                 Official Reporter - U.S. District Court
                          (415)  531-6587

                                                    39

1        MR. MENNEMEIER:  Stifel, Nicolaus.
2        THE COURT:  Stifel's lawyers here -- I'm ordering him
3   that if I find out that Stifel has been soliciting, this T.R.O.
4   runs against you.
5        MR. HUGHES:  Understood, your Honor.
6        THE COURT:  So don't try to get around it indirectly
7   by saying, "Well, they weren't a party."
8        So this is just for 15 days until you get before
9   FINRA, and FINRA can fix it up any way that's right; but in my
10  judgment, whatever rights the plaintiff is going to be able to
11  establish will completely have been evaporated in 15 days, so
12  the further solicitation will stop of clients for 15 days.
13  Well, until such time as FINRA or this Court modifies its --
14  I'm basing this -- I'm saying 15 days only because that's what
15  counsel have told me.
16       Now, all information that these four defendants have
17  taken with them of any type must be preserved.  It's evidence
18  now.  And if the Court finds out there's been any destruction,
19  including e-mails and so forth, it will be destruction of
20  evidence, and I will have to consider referring it to the
                          Page 35

071010_WHA_2

21  U.S. Attorney for obstruction of justice, so don't go there.

22  Preserve the evidence.

23          whatever accounts that they have already managed to

24  get -- the 240 -- more power to them.  They're going to have

25  to -- at least, I'm not going to stop them.  For the time

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

40

1  being, they get to continue on using, servicing those clients,

2  and any more that are in the pipeline for which the paperwork

3  is already started.  They're going to be able to get those, but

4  there won't be any new active solicitations from this day

5  forth.

6          Now, the plaintiff is ordered that if a client calls

7  in and says, "I want to talk to Mr. Slayden.  Where is he?"

8  You say, "He's gone to work for another firm, but here's his

9  phone number," so that if somebody's trying to reach him, you

10  don't sabotage his efforts to maintain -- and then if that

11  client calls Mr. Slayden, it's perfectly okay for Slayden to

12  call back and to talk to that person and, in my judgment,

13  solicit that person to come over, but that's because the phone

14  call was initially made by -- and so your company on the

15  plaintiff's side ought to keep good records of who's called in.

16          MR. PADUANO:  We will, your Honor.

17          THE COURT:  I think that's all I have.

18          What else do you have for me?

19          MR. PADUANO:  Your Honor, one thing as to what the

20  Court -- Mr. Lee -- in terms of the documents Mr. Lee must

21  bring as a corporate representative for A.G. Edwards, we would

22  ask -- I just heard his name as the person who hired

23  Mr. Slayden.  We'd ask that the records that Mr. Slayden gave

071010_WHA_2

24   to A.G. Edwards in some form.  I don't want to limit it -- that

25   Mr. Lee says somebody else got them.  I don't know what

                              Lydia Zinn, CSR,  RPR
                   Official Reporter -  U.S. District Court
                              (415)  531-6587

                                                      41

1    Mr. Lee --

2            THE COURT:  Well, look.  Any records that Mr. Lee

3    knows went from A.G. Edwards to Stifel -- whether it came

4    directly to Lee or to someone else, if he knows about it, he's

5    got to take them to a deposition the deposition; but I am not

6    going to require that he be under some hell-or-high-water

7    commitment to go out and dig up everything.  This is all on a

8    hurry-up basis.

9            MR. PADUANO:  I understand.  Thank you.

10           THE COURT:  So he doesn't have to do a big-firm,

11   scorched-earth search to find all those materials.

12           MR. MENNEMEIER:  Your Honor, I had a couple

13   questions, too.

14           THE COURT:  Of course.  Go ahead.

15           MR. MENNEMEIER:  First of all, in the deposition of

16   Mr. Hatcher, we didn't talk about any documents he would bring.

17           THE COURT:  What documents could he bring?  What do

18   you want?

19           MR. MENNEMEIER:  Well, I would -- any documents, if

20   he has any, that would support the allegations he made in his

21   declaration.

22           THE COURT:  Fine.  Any documents that Mr. Hatcher has

23   that he believes support the allegations made in his

24   declaration should be brought to the deposition.

25           MR. MENNEMEIER:  And then my second question,

                              Lydia Zinn, CSR,  RPR

071010_WHA_2
Official Reporter -  U.S. District Court
(415)  531-6587

42

1   your Honor, was:  I just wanted to make sure I was clear on the

2   effect of the Court's order after 15 days.

3          THE COURT:  Well, it stays in effect ad infinitum,

4   until FINRA modifies it or until I modify it, but I will tell

5   you that I'm not going to put a terminal date on it, because I

6   expect that it will go forward in 15 days, but for your

7   benefit, if the -- if it doesn't start in 15 days, and there's

8   a snafu, you come in and see me, and I may vacate this, because

9   I will tell you I don't trust NASDAQ or -- not NASDAQ.  What is

10  it? -- NASD.

11         All those arbitration outfits -- they are delay city.

12  And if there's delay city involved here because the plaintiff

13  has gotten some relief and wants to drag it out, I'm going to

14  vacate the order.  So it's -- the burden is on the plaintiff to

15  get in there and get this arbitration going, and to stop the

16  delay city.

17         I have taken cases back.  I won't dismiss a NASD

18  thing.  I will give them six months to get it done.  If this

19  doesn't do it, I'll bring in a jury and we'll try the case,

20  because the NASD is a -- NASD -- I don't want to say it's a

21  gimmick, but -- because it's better than a gimmick.  It's just

22  a procedural mechanism to delay justice in some cases.

23         So I feel the same way here.  This thing doesn't get

24  off the ground, and you feel like you're being delayed or you

25  get into it and they start dragging their feet because they've

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

43

071010_WHA_2

1   got three of them, they can't agree on it, you come see me.

2   We'll get a jury to decide this case.  Then you can all fight

3   it out in the Ninth Circuit; but I'm telling you that this

4   arbitration has been greatly overblown and overstated as to its

5   true value.  The original court resolution system works a lot

6   better than arbitration because it's faster, so forth.  I'll

7   promise you you'll have a resolution of this probably by

8   December 31 if you stay here.

9          I urge you both to think about doing that, but I'm

10  going to assume that until I hear otherwise, but if it does go

11  into this FINRA thing, then we'll give that a fair, good-faith

12  shot.  See how it goes.  Maybe it will be over and expedited,

13  just like Counsel says.

14         Okay.  I need to run.  All right.  You two meet and

15  confer.  Give me a form of order by Friday.  Would you, please?

16         MR. PADUANO:  We'll do that, your Honor.

17         THE COURT:  That captures what we've done here.  All

18  right?  But the order is in effect right now.

19         MR. MENNEMEIER:  That's clear, your Honor.  Thank

20  you.

21         THE COURT:  It's verbal, but you can put it in

22  writing.  I would appreciate it.  Thank you.

23         (Proceedings adjourned at 2:08 p.m.)

24                     -   -   -   -

25

                         Lydia Zinn, CSR,  RPR
              Official Reporter -  U.S. District Court
                            (415)  531-6587

⧠

CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States

Page 39

071010_WHA_2

Court, Northern District of California, hereby certify that the foregoing proceedings in C-07-05154-WHA, A.G. EDWARDS & SONS, INC., V. SAMUEL SLAYDEN, DENISE GILSETH, CATHY MCJILTON, AND KELLY STROMGREN, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

Lydia Zinn, CSR 9223, RPR
Wednesday, October 10, 2007

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587